OPINION OF THE COURT
Wachtler, J.
In this suit for damages brought by the family and estate of a woman killed by a burglar, a jury found the City of Buffalo and the County of Erie liable for negligent processing of and response to the victim’s call for emergency assistance made on the special 911 number established and serviced by the defendants. The Appellate Division affirmed the judgment with two Judges dissenting and the defendants have appealed.
Two primary issues are presented on the appeal. First, whether by creating the special service, accepting the call for emergency assistance and assuring the caller that help was on the way, the municipal agencies may be said to have established a special relationship with and duty to her, sufficient to hold them liable for negligently directing the police patrol cars to the wrong locality and taking no further action when the responding officers reported no such address as that given. Second, whether the trial court erred in permitting expert testimony concerning the monetary value of a housewife’s services on the issue of damages.
In October, 1976 the decedent, Amalia De Long, resided with her husband and three small children in Kenmore, a village adjacent to the City of Buffalo. Her home at 319 Victoria Boulevard was located approximately 1,300 feet from the Kenmore Police Department. One of her neighbors was a captain in that department.
On the morning of October 25 she telephoned for emergency police assistance by dialing 911. At 9:29 her call was answered by a complaint writer employed by Erie County to respond to such requests. The call, lasting approximately 14 seconds, was recorded in its entirety as follows:
Caller: “Police?”
Complaint Writer: “911.”
*301 Caller: “Police, please come, 319 Victoria right Caller: away.”
Complaint Writer: “What’s wrong?”
Caller:
“I heard a burglar; I saw his face in the back; he was trying to break in the house; please come right away.”
Complaint Writer:
“Okay, right away.”
Caller:
“Okay.”
The complaint writer erroneously reported the address as 219 Victoria, and mistakenly assumed that the call had originated in Buffalo because he knew there was a Victoria Avenue in the city. Accordingly, after stamping the complaint card “flash” to indicate its high priority, he placed it on a conveyor belt which ran through a glass partition to the radio dispatcher for the Buffalo Police Department. At 9:30 the dispatcher broadcast a report of a burglary in progress to patrol cars in the vicinity of Victoria Avenue in the city. Three minutes later the officers who had responded to the call informed the dispatcher that there was no such address and that the highest number on Victoria was 195. At 9:34 the dispatcher “cleared the call”, in effect telling the officers at the scene to disregard it. The dispatcher himself took no further action on the call.
At approximately 9:42 Mrs. De Long was seen running from her house, unclothed and bleeding profusely. She collapsed on the sidewalk in front of her home. A neighbor called the Kenmore Police and within a minute a police car responded — a few minutes later paramedics arrived. However by 9:53 she displayed no vital signs. An autopsy revealed that she had been stabbed several times and had died from loss of blood.
After filing a notice of claim against the city and the county, the decedent’s husband commenced an action seeking damages for wrongful death and conscious pain and suffering.
At the trial it was shown that prior to 1975 the City of Buffalo had adopted the 911 number as the one to call for emergency services, including police and fire protection. At that time a person dialing the number within the city *302 would immediately be connected with the Buffalo Police Department where a complaint writer would take the information and give it to a radio dispatcher who in turn would contact the appropriate patrol cars or other emergency vehicles. The complaint writers, originally police officers and later mostly civilians, together with the dispatchers were trained and supervised by a lieutenant or acting lieutenant from the Buffalo Police Department. In March of 1975 Erie County formed a new agency known as Central Police Services which took over the complaint writing function from the city and extended the 911 service to several communities beyond the city limits, including the Village of Kenmore. Thus in 1975 and 1976 the telephone directory for Erie County listed 911 as the emergency number for the “local police”.
Under the system adopted by the county, however, a 911 call made within the City of Buffalo or the extended area would not automatically connect the caller with the police department servicing the caller’s area. Instead the call would go to the Center for Emergency Services which, pursuant to an agreement with the city, was located in the old 911 room in the Buffalo Police Department headquarters. The stated purpose of the center was to “accept telephone requests for emergency services for all Public Safety Agencies within the service area of the Center, and relay, transfer, or forward such requests to the Public Safety Agency concerned, without requiring the caller to re-dial another telephone number.” At this center the county employed its own complaint writers many of whom, including the one who answered the call in this case, had held the same position with the city. In accordance with the agreement the city was required to provide training, supervision and assistance to the complaint writers for a year or more and was still doing so in October, 1976. A Buffalo police lieutenant or acting lieutenant remained in the room to coordinate the activities of the complaint writers and Buffalo police dispatchers and to furnish assistance of a supervisory nature when necessary.
Most of the procedures previously followed by the city were adopted by the county and incorporated in the “Manual for 911 Services”. The major additional requirement *303 imposed by the county was that the complaint writers obtain information concerning the location or municipality involved so that the complaint could be forwarded to the police department or other emergency service responsible for that area. This was the subject of additional training for those complaint writers who had previously been employed by the city. They were further instructed to determine the origin of the call at the outset because calls from the city were necessarily processed differently from those originating elsewhere. In the case of city calls the complaint card was placed on a conveyor belt which ran to the Buffalo police dispatcher’s office in the room next to the center. For the noncity calls, buttons were installed at the complaint writer’s desk which permitted him to immediately transfer the call to the appropriate agency and monitor it to insure that the connection had been made and that the call had been properly routed.
There was also a standard operating procedure for cases in which officers responding to the scene of a priority complaint reported “no such address”. In that event the dispatcher was required to notify the lieutenant in charge or the complaint writer. They in turn would either replay the recording of the call to check the information or consult one of the street directories or “duplicate street” listings available at the center to determine whether the address provided could be located in another community.
The transcript of the recording and the testimony of various witnesses connected with the center showed that the complaint writer had failed to comply with the applicable regulations in several respects. He had neglected to obtain (1) the caller’s name, (2) the complete street address which would have indicated Victoria Boulevard and not Victoria Avenue as he assumed and (3) the name of the locality or municipality where the call originated. He also neglected to verify the information by repeating it.
In addition, the police dispatcher completely neglected to initiate the follow-up procedures. He had not notified the lieutenant in charge or the complaint writer that the investigating officers could find no such address. He had simply disregarded the call because he assumed it was a “fake”.
*304 On the issue of damages for wrongful death the plaintiff called an economist who, over the defendants’ objection, testified concerning the value of a housewife’s services.
The jury returned a verdict for the plaintiff awarding $200,000 for conscious pain and suffering and $600,000 for wrongful death. Each of the defendants was found 50% responsible for the loss.
The Appellate Division affirmed. Two Justices dissented solely on the ground that a new trial should be granted with respect to the amount of damages recoverable for the wrongful death.
On this appeal the defendants initially contend, as they did in the courts below, that the complaint should be dismissed in its entirety because they owed no special duty to protect the decedent from an attack by a third party. The argument is based on the familiar rule that a municipality cannot be held liable for negligence in the performance of a governmental function, including police and fire protection, unless a special relationship existed between the municipality and the injured party (see, e.g., Garrett v Holiday Inns, 58 NY2d 253; Florence v Goldberg, 44 NY2d 189; Riss v City of New York, 22 NY2d 579; Motyka v City of Amsterdam, 15 NY2d 134; Schuster v City of New York, 5 NY2d 75; Steitz v City of Beacon, 295 NY 51).
This, of course, is not a case in which there was no contact between the victim and the municipality prior to her death. The plaintiff is not seeking to hold the defendants liable as insurers for failing to protect a member of the general public from a criminal act of which they were not aware but should have anticipated and prevented (see, e.g., Weiner v Metropolitan Transp. Auth., 55 NY2d 175; cf. Tuthill v City of Rochester, 27 NY2d 558). He is not urging that there should be a police officer on every corner or at every place where a crime is likely to occur (cf. Steitz v City of Beacon, supra). Nor is this a case in which the police refused a plea for assistance (e.g., Riss v City of New York, supra; cf. Messineo v City of Amsterdam, 17 NY2d 523) or failed to offer assistance when confronted with a situation arguably requiring police intervention (e.g., Pinkney v City of New York, 40 NY2d 1004; Evers v Westerberg, 32 NY2d 684). In those instances it has been urged with some force *305 that the proper allocation of public resources and available police services is a matter for the executive and legislative branches to decide (Riss v City of New York, supra).
In this case the decision had been made by the municipalities to provide a special emergency service which was intended and proclaimed to be more efficient than normal police services. Those seeking emergency assistance were advised not to attempt to call the general number for the local police, which ironically might have avoided the tragedy encountered in this case, but were encouraged to dial the 911 number to obtain a quicker response. In addition, and most significantly, the victim’s plea for assistance was not refused. Indeed she was affirmatively assured that help would be there “right away”. Considering the fact that she was merely a .block and a half from the local police station, and was not yet at the mercy of the intruder, it cannot be said as a matter of law that this assurance played no part in her decision to remain in her home and not seek other assistance. Unfortunately, it only increased the risk to her life.
Under similar circumstances it has been held that a special relationship was created so as to require the municipality to exercise ordinary care in the performance of a duty it has voluntarily assumed. Thus a city may be held liable for neglecting to provide crossing guards for school children when it has voluntarily undertaken the task which the children’s parents could justifiably expect to be regularly and properly performed (Florence v Goldberg, supra). Similarly a municipality which has affirmatively certified a building as safe may be held liable to the owners for injury caused by known, blatant and dangerous violations (Garrett v Holiday Inns, supra; but also see O’Connor v City of New York, 58 NY2d 184). The basic principle, as Judge Cardozo observed, is this: “If conduct has gone forward to such a stage that inaction would commonly result, not negatively merely in withholding a benefit, but positively or actively in working an injury, there exists a relation out of which arises a duty to go forward” (Moch Co. v Rensselaer Water Co., 247 NY 160,167; see, also, Zibbon v Town of Cheektowaga, 51 AD2d 448, app dsmd 39 NY2d 1056).
*306 Whether a special duty has been breached is generally a question for the jury to decide (see, e.g., Florence v Goldberg, supra, p 197). But it should be emphasized that whether the municipality has acted reasonably depends upon the circumstances of the particular case. When an emergency service is involved it must be recognized that the circumstances are often quite demanding and that some mistakes will occur, even when the service is well organized and conscientiously administered. Allowance must be made for this and although any error, however slight, may have dire consequences it will not always justify an award for damages. In this case, however, there was ample basis for the jury to conclude that neither defendant exercised ordinary care in the handling of the call and that they should share responsibility for the foreseeable consequences. We have therefore concluded that there is no basis for reversing and dismissing the complaint against either defendant.
The defendants also contend that the court’s charge to the jury concerning a special relationship was deficient, particularly in view of the fact that the court failed to give the jury any specific instructions with respect to the decedent’s reliance. The defendants correctly observe that this was an essential element of the plaintiff’s cause of action in this case. However, the defendants neglected to bring this omission to the court’s attention when the case was submitted to the jury and therefore the issue is not preserved for review (CPLR 4110-b; see, also, CPLR 4017). We would simply note, as we have above, that there was evidence in the record from which the jury could have found reliance in this wrongful death action (cf. Noseworthy v City of New York, 298 NY 76; Reilly v New York City Tr. Auth., 34 NY2d 764).
The only remaining question is whether the defendants are entitled to a new trial with respect to damages for the wrongful death because the trial court permitted expert testimony concerning the monetary value of a housewife’s services. This was the only legal issue which produced disagreement at the Appellate Division. A majority of that court decided not to follow earlier Appellate Division opinions which had precluded such testimony (Zaninovich v *307 American Airlines, 26 AD2d 155; Ashdown v Kluckhohn, 62 AD2d 1137). The question has frequently arisen in other jurisdictions (see Admissibility and Sufficiency of Proof of Value of Housewife’s Services in Wrongful Death Action, Ann., 77 ALR3d 1175). This, however, is the first occasion this court has had to address the issue.
As a general rule the admissibility of expert testimony on a particular point is addressed to the discretion of the trial court (Selkowitz v County of Nassau, 45 NY2d 97). The guiding principle is that expert opinion is proper when it would help to clarify an issue calling for professional or technical knowledge, possessed by the expert and beyond the ken of the typical juror (People v Allweiss, 48 NY2d 40, 50; Selkowitz v County of Nassau, 45 NY2d 97, supra; Dougherty v Milliken, 163 NY 527).
Here the plaintiff called an economist to offer his opinion of the market value of the types of services performed by the average housewife in the decedent’s circumstances. This evidence was relevant to the issue of damages on the wrongful death cause of action which is fixed by statute as follows: “fair and just compensation for the pecuniary injuries resulting from the decedent’s death to the persons for whose benefit the action is brought” (EPTL 5-4.3). When the decedent is a housewife who is not employed outside the home the financial impact on the survivors, aside from compensable losses of a personal nature (see, e.g., Tilley v Hudson Riv. R. R. Co., 24 NY 471), will not involve a loss of income but increased expenditures to continue the services she was providing or would have provided if she had lived.
Undoubtedly most jurors have at least a general awareness of the various services performed by a housewife. It is doubtful, however, that they are equally knowledgeable with respect to the monetary equivalent of those services. Although it was once thought that this was not a subject which would lend itself to scientific inquiry and analysis (see, e.g., Zaninovich v American Airlines, supra), that can no longer be said today. It is now apparent, as a majority of courts have held (see Ann., 77 ALR3d 1175), that qualified experts are available and may aid the jury in evaluating the housewife’s services not only be *308 cause jurors may not know the value of those services, but also to dispel the notion that what is provided without financial reward may be considered of little or no financial value in the marketplace. We conclude that it was not an abuse of discretion to allow the expert testimony in this case.
Accordingly, the order of the Appellate Division should be affirmed.
Chief Judge Cooke and Judges Jasen, Jones, Meyer, Simons and Kaye concur.
Order affirmed, with costs.