OPINION OF THE COURT
Louis C. Benza, J.
This claim arises from the death of Aaron Boland and the physical and psychological injuries suffered by his sister Jennifer in January 1989; claimant Walter Boland is Aaron and Jennifer’s father. The children were victims of child abuse inflicted by their then stepmother, Penny Lee Boland, with whom they were living while their father, a sergeant in the United States Army, was stationed in Europe. The State’s liability for their injuries is premised on the alleged negligence, carelessness and gross negligence of those operating the New York State Child Abuse Hotline, also known as the Statewide Central Register (SCR) (Social Services Law § 422). Defendant moves for summary judgment dismissing the claim on the grounds that its activities in operating the hotline are protected by sovereign immunity, that claimant Walter Boland has failed to establish that a special duty was owed to his *1021 children or to him, and that operation of the child abuse hotline is a uniquely governmental activity.
FACTUAL BACKGROUND
Claimant Walter Boland, who was divorced from Jennifer and Aaron’s natural mother, married Penny Ammerman in April 1988. Shortly thereafter, he received orders to report to duty in Germany and was informed that it would take at least six months for family housing to become available at his new post. In the interim, Penny Boland and the children moved in with her father, who lived in a trailer park in Canandaigua, New York, which is located in Ontario County. Walter Boland left for Germany in September 1988, at which time Jennifer was 5 Vi years old and Aaron was 2 Vi years old.
In statements provided to the police after the events in question here and in deposition testimony given in connection with this action, Tara Reeve and Linda Siesto, two neighbors in the trailer park, state that after Walter Boland’s departure, they often observed cuts and bruises on the children, particularly Aaron, and that they were not fully satisfied with the explanations given by Penny Boland to account for the marks. At approximately 2:30 p.m. on January 23, 1989 as they were waiting for their children at the school bus stop, Mrs. Reeve was approached by Aaron Boland, who said “[l]oak at my booboo”. Both women observed what they described as a “terrible” bruise on the left side of Aaron’s head, along with other marks. Penny Boland, who was standing nearby, volunteered that Aaron had fallen out of a chair and hit his head.
After returning to her house, Mrs. Reeve and her friend decided that they should do something about their suspicions. Mrs. Siesto initially called the Ontario County Social Services Department, Child Protective Unit (CPU), but was told that any report of suspected child abuse had to be made to the 800 SCR hotline (see, Social Services Law § 422 [13]). The person who answered the SCR hotline said that all operators were busy and asked for a number at which the call could be returned; Mrs. Siesto gave Mrs. Reeve’s phone number and said that “either Linda or Tara could provide the information”. At approximately 5:00 or 5:30 p.m., Mrs. Reeve received the call from SCR and gave a statement about the bruises and the suspicions of abuse, stressing, she says, that something should be done. She was told that the matter would be "looked into” and anticipated, based on knowledge from other sources, that an investigator would be looking into the matter within *1022 24 hours.[1] Mrs. Reeve saw Aaron again the following day, January 24, at which time he appeared to be okay, but both she and Mrs. Siesto were concerned that apparently no investigator had visited the child’s home in response to their call.
Records at the SCR hotline office indicate that at approximately 5:00 p.m. on January 23, 1989, information about Aaron and Jennifer was taken down by an SCR intake specialist. Her DSS-2221 report lists only the first names of the children and their mother, indicates that a grandfather is also a member of the household, and notes the Bolands’ correct address in Canandaigua. The source of the call is listed as "Anon.”; there is no notation giving Mrs. Reeve’s telephone number and no indication that the informants identified themselves as Linda and Tara. The substance of the call was summarized as follows:
"Aaron is seen at least twice per month w/ facial bruises. [Mother] gives varying excuses. Today Aaron had a couple [of] fading bruises on his forehead, as well as fading bruises around his mouth & cheek appearing to be fingerprints.
"[Mother’s] explanation of these bruises is that [child] was choking & fell out of a chair. Bruises are inconsistent w/ [mother’s] explanation. Source concerned because [child] too frequently has facial bruises of [unknown] origin.
"[Mother] often said that Aaron is bad & he has the devil in him. Source feels Aaron doesn’t misbehave. Aaron appears nervous & withdrawn. Jennifer is also seen w/ bruises but not frequently.”
After receiving the call and deciding that the information could reasonably constitute a report of child abuse, the SCR worker filled out the report form and immediately took steps to convey the information to the CPU in the county where the suspected abuse was occurring (Social Services Law § 422 [2]). Unfortunately, she apparently thought that Canandaigua was located in Oneida County, rather than Ontario County, and either did not refer to the reference guides available to assist workers in verifying locations around the State or misread the information contained therein. The report of suspected abuse was therefore relayed to Joseph A. Cantar ana, a CPU worker in Oneida County. In a tragic coincidence, Mr. Cantar ana was *1023 also unfamiliar with the location of Canandaigua and apparently did not consult any of the maps or other resources that were available to him. The mistake was not discovered until the following morning, January 24, when Mr. Cantar ono’s report was given to his supervisor; he was directed to immediately notify SCR that the report had been sent to the wrong county.
Mr. Cantarano received a busy signal on his first attempts to reach SCR and, at approximately 11:00 a.m., he described his problem to Marita Scott, an SCR worker who had called him on another case. Ms. Scott apparently understood the matter to involve a routine "transfer” (a procedure followed when a family already under investigation moves from one county to another) and therefore directed him to call the "County Line” number at SCR. This number is answered by a recording machine, and Mr. Cantar ano’s message was not transcribed until later in the afternoon of January 24. The matter was treated as a routine transfer, which had to be processed within 24 hours, rather than an incorrect assignment, which would require the immediate attention of a supervisor.
The report of suspected abuse was ultimately transmitted by an SCR County Line unit worker to the Ontario County CPU at approximately 10:10 a.m. on the morning of January 25. Shortly thereafter, a CPU worker went to the address listed in the report, only to learn that both children had been hospitalized earlier that morning. The children were immediately placed in protective custody, but Aaron Boland died from his injuries on January 31. Penny Boland was subsequently found responsible for causing his death, and she is now incarcerated in a State correctional facility. Jennifer Boland lives with her father, who is no longer stationed overseas.
It is the State’s position that because operation of the SCR hotline is a governmental function, designed to protect the general public, there can be no liability to persons who are harmed by the actions of State workers in its operation unless it can be shown that a special duty was owed to the injured party. Claimant asserts that, under these circumstances, a special duty was owed to Aaron and Jennifer Boland and, alternatively, argues that the errors committed by SCR workers in this instance were ministerial in nature and thus not entitled to immunity.
*1024 SPECIAL DUTY
When, acting in a governmental, as opposed to proprietary, role,[2] neither the State nor its political subdivisions may be held liable for injuries arising from its acts of commission or omission, even if they are negligently performed, because proper allocation of public resources and available services is for the executive and legislative branches to decide (Riss v City of New York, 22 NY2d 579). Governmental activities, such as the provision of police protection, give rise to duties owed to the public-at-large, not to a specific person or class of persons (Cuffy v City of New York, 69 NY2d 255, 260). An exception to this rule is recognized, however, where it can be shown that there was a special relationship between the State and the injured party giving rise to a unique duty owed to that individual (Sorichetti v City of New York, 65 NY2d 461; De Long v County of Erie, 60 NY2d 296).
A special relationship exists where the public corporation has voluntarily assumed a duty, the proper exercise of which was justifiably relied upon by persons benefitted thereby (Florence v Goldberg, 44 NY2d 189; 62 NY Jur 2d, Government Tort Liability, § 18). To establish that such a relationship and the resultant special duty exist, it is necessary for claimant to prove the following: "(1) an assumption by the [governmental agency], through promises or actions, of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on the part of the [State’s] agents that inaction could lead to harm; (3) some form of direct contact between the [State’s] agents and the injured party; and (4) that party’s justifiable reliance on the [State’s] affirmative undertaking.” (Kircher v City of Jamestown, 74 NY2d 251, 257; Cuffy v City of New York, 69 NY2d 255, 260, supra.)
The statutory directives governing operation of the SCR hotline create an affirmative duty on the part of State officials, to take certain actions on behalf of any child once information is received that they determine could "reasonably constitute a report of child abuse or maltreatment” (Social Services Law § 422 [2] [a]). This, coupled with the SCR worker’s statement to Mrs. Reeve that the matter would be "looked into”, satisfies the first requirement for establishing the existence of a special duty. In addition, from the very nature of the problem which the State is seeking to address by setting up the hotline and *1025 from the statutory requirements mandating prompt and, in some instances, immediate action, knowledge that delay could lead to serious harm is inescapably present. As is typical in special duty cases, the more difficult issues are presented by the two remaining requirements, which are somewhat interrelated. Discussions in case law suggest that the issue of reliance is particularly critical, since it has significant public policy implications and is also closely linked to the question of causation.
Human error which results in the improper routing of a citizen’s request for governmental protection may result in liability being imposed under the theory of special duty (De Long v County of Erie, 60 NY2d 296, supra). And it is possible for the contact with public officials to have been made not by the ultimate victim but by a parent or someone otherwise responsible for the well-being of the victim (Sorichetti v City of New York, 65 NY2d 461, supra; Florence v Goldberg, 44 NY2d 189, supra). Thus in Cuffy v City of New York (69 NY2d 255, supra), assurances given by police to a husband and father were held to create a duty also toward his wife and a younger son who resided with them. Those same assurances, however, were held insufficient to create a special duty with respect to an older son who did not reside in the household and who simply happened to stop by for a visit.
Where the contact is not with the victim or a family member of the victim but with an unrelated third party, a special duty does not arise, in large part because the element of reliance cannot be established (Helman v County of Warren, 67 NY2d 799). In Bogart v Town of New Paltz (145 AD2d 110), assurances given to a passing motorist who reported that she had observed a vehicle stuck in an icy pond were held insufficient to create a special duty toward the passengers of that vehicle. The Third Department stated: "The requirement of direct contact serves to rationally limit the class of citizens to whom the municipality’s special duty extends and is necessary to establish a special relationship beyond that which all citizens share with government” (supra, at 113, citing Cuffy v City of New York, 69 NY2d 255, 261, supra).
The question of what constitutes sufficiently direct contact is inextricably interwoven with the question of whether the injured party did, or at least could have, reasonably relied on the assurances of governmental assistance. "That element [reliance] provides the essential causative link between the 'special duty’ assumed by the municipality and the alleged *1026 injury. Indeed, at the heart of most of these 'special duty’ cases is the unfairness that the courts have perceived in precluding recovery when a municipality’s voluntary undertaking has lulled the injured party into a false sense of security and has thereby induced him either to relax his own vigilance or to forego other available avenues of protection.” (Cuffy v City of New York, 69 NY2d 255, 261, supra [citations omitted].) These observations also point out the connection between the element of reliance and the question of causation.
In Kircher v City of Jamestown (74 NY2d 251, supra), a woman was accosted, assaulted and pulled into a car which then sped off. The event was observed by two witnesses to whom the woman screamed for help. The witnesses followed in their own car for a short distance and even attempted to cut off the abduction vehicle at one point. Losing sight of the vehicle the would-be rescuers encountered a police officer and gave him the information of the abduction, complete with a description of the car and its license plate number. The officer said that he would "call it in”. The would-be rescuers made no further effort to contact officials, although they remained concerned and drove by the woman’s house several times to see if her car had returned. Despite his assurances, the police officer never reported the incident or took any other action. The abducted woman was beaten and repeatedly raped before being released by her abductor some 12 hours later. She subsequently sued the police officer and the City for their alleged negligence in failing to rescue her.
The Court of Appeals held that, in these circumstances, neither direct contact nor justifiable reliance were established. "Plaintiff, by virtue of her unfortunate circumstances, could not communicate with the police and thus obviously could not rely on their assurances of assistance” (Kircher v City of Jamestown, supra, at 257). In a subsequent case, Merced v City of New York (75 NY2d 798), it was reaffirmed that the involvement of third parties cannot satisfy the requirements of direct contact and justifiable reliance.
Applying the requirements for the creation of a special duty to the facts of the instant claim and with particular reference to the somewhat similar circumstances presented in Kircher (supra), the inescapable conclusion is that the State did not have a special relationship with and thus did not owe a special duty to the Boland children. The neighbors who called the SCR hotline were not members of the children’s household or otherwise related to or responsible for them. *1027 There is, in fact, less connection between the Boland children and these neighbors than there was between the victim and third parties in Kircher (supra), since in that case the abducted woman actively sought the assistance of the witnesses who were acting on her behalf. In addition, there are simply no facts from which it can be inferred that the children or anyone responsible for their welfare relied in any fashion on the promise of official intervention. The children were completely unaware that public officials had been contacted on their behalf or that assurances of help had been given, and— even if the Court of Appeals permitted consideration of the reliance placed on official assurances by the third parties who might otherwise have continued their efforts on the victim’s behalf — there is nothing in the statements before us to suggest that Mrs. Reeve or Mrs. Siesto were so certain of their suspicions that they were prepared to take any other steps, at least during the relevant time period. The holding in Kircher controls and compels a conclusion that the State did not owe a special duty to Aaron and Jennifer Boland to act on their behalf.
LIABILITY FOR MINISTERIAL ACTIONS
A second exception to the general rule that the State and its subdivisions are not liable for negligence in carrying out their purely governmental functions is where the injury results from negligence in an activity that is ministerial, as opposed to discretionary or quasi-judicial. "[Discretionary or quasi-judicial acts involve the exercise of reasoned judgment which could typically produce different acceptable results whereas a ministerial act envisions direct adherence to a governing rule or standard with a compulsory result” (Tango v Tulevech, 61 NY2d 34, 41; see also, Tarter v State of New York, 68 NY2d 511, 517).
Section 422 (2) (a) of the Social Services Law provides, in pertinent part, that whenever an SCR worker receives information via the hotline that, in the worker’s determination, could reasonably constitute a legitimate report of child abuse or maltreatment, "such allegations shall be immediately transmitted orally or electronically by the department to the appropriate local child protective service for investigation.” The SCR complaint writer who took the call regarding Aaron and Jennifer Boland determined that the information should be reported, an act that is obviously discretionary in that it *1028 calls for the exercise of reasoned judgment. Once that determination was made, her specific duty to transmit the information to the appropriate local CPU was clear and unambiguous, requiring no further exercise of judgment or discretion.[3] Defendant contends, however, that the State cannot be liable for negligence even in connection with the ministerial tasks involved in uniquely governmental functions such as the operation of a child abuse hotline.
The court must, first of all, question the assumption that gathering information on and providing protection to abused children is something that only governments do. Private, nonprofit organizations such as the Society for the Prevention of Cruelty to Children have historically engaged in such activity and continue to do so with full governmental approval and authority. (See, Not-For-Profit Corporation Law § 1403; Judiciary Law §§ 478, 484.) But there is an even more significant problem with this argument. Counsel for defendant relies exclusively on the Third Department’s decision in Williams v State of New York (90 AD2d 861, 862), in which it was stated, in connection with operations of the Department of Motor Vehicles (DMV), that the State "is not liable for any act which is completely sovereign in nature and completely foreign to any activity which could be carried on by a private person.” This decision, and counsel’s expansive interpretation of its holding, was discussed at length by Judge Gerard M. Weisberg in Bell v State of New York (140 Misc 2d 778), and we agree with his conclusion that Williams has been "essentially overruled” (supra, at 782).
In Ford Motor Credit Co. v State of New York (133 AD2d 980), the Third Department rejected the idea that its ruling in Williams (supra) "created a blanket of sovereign immunity for all of the State’s motor vehicle record-keeping activity” (supra, at 981) and held the State liable to a lienholder whose secured interest in a vehicle was negligently omitted from the certificate of title. "[Claimant alleges that after exercising his discretion and deciding to issue the certificate, the Commissioner and his employees were negligent in performing the ministerial tasks involved in preparing the paperwork and issuing the certificate of title. In this regard, the statutes and *1029 regulations permit no exercise of reasoned judgment which could typically produce different acceptable results.” (Supra, at 982.) These acts on the part of DMV officials were held to be ministerial and thus not protected by sovereign immunity.
Aside from the discredited authority of Williams (supra) and its direct progeny (also discussed by Judge Weisberg), there is no reason to question the proposition that a governmental entity can be liable for harm caused by negligence of its employees in carrying out ministerial tasks, even if those tasks are part of a function that is strictly and uniquely governmental in nature. This accepted basis of liability has been fully recognized by the Court of Appeals on a number of occasions, its decisions in Tarter v State of New York (68 NY2d 511, supra) and Tango v Tulevech (61 NY2d 34, supra) being the most commonly cited.
A review of cases decided in the years since the decision in Tango (supra) was issued reveals that liability — or at least potential liability — has been found in a variety of situations. Some of the duties which have been held to be purely ministerial in nature include the following:
A city’s duty to prevent blasting between the hours of 8:30 a.m. and 3:30 p.m. on any day when school is in session (San Marco Constr. Corp. v Aetna Cas. & Sur. Co., 162 AD2d 514, 517).
A building inspector’s duty to "adhere to the definite standards” of the relevant building code (Matter of Filmways Communications v Douglas, 106 AD2d 185, 186).
A Deputy Sheriff’s duty to properly retire a warrant (Glowinski v Braun, 105 AD2d 1153).
A coroner’s statutory duty to personally go to the site where a body is located when a death occurs (Rotondo v Reeves, 153 Misc 2d 769).
The duty of an employee of the State Employees’ Retirement System to provide accurate information about an individual’s employment status (Skwiersky v State of New York, 143 Misc 2d 366, 370).
Correction official’s duty to comply with relevant regulations by conducting a disciplinary hearing within seven days from an inmate’s initial confinement on charges (Gayle v State of New York, 135 Misc 2d 570, 573).
The duty of an agency’s office worker to properly convey an executed change of beneficiary form to the Comptroller’s office (Johnson v State of New York, 131 Misc 2d 630, 634).
*1030 In the instant case, once the SCR intake specialist assessed the information she received about the Boland children and decided — in an exercise of discretion — that the information reasonably constituted a report of child abuse, she was under a statutory duty to "immediately” convey that information to the "appropriate” local child protective unit (Social Services Law § 422 [2] [a]). The location of a city within this State is an item of concrete, indisputable information that can be obtained easily, particularly given the resources kept available for SCR workers. There is only one correct "answer” and it does not require reasoning or judgment to arrive at that answer. Although counsel for defendant argues that there is no evidence the SCR worker failed to refer to the available references to determine the location of Canandaigua, it is self-evident that she either did not refer to them or, through negligence, incorrectly read the information contained therein, for there is only one Canandaigua, New York, and it is located in Ontario, not Oneida, County.
It is impossible to reach any conclusion other than to find a required task that does not require any "exercise of reasoned judgment” and that could not "typically produce different acceptable results” (Tango v Tulevech, 61 NY2d 34, 41, supra). Because the task is ministerial in nature, her negligence in performing it can provide a basis for finding the State liable, if it is determined that this negligence was a proximate cause of the injuries suffered by the children. The court holds, therefore, that although claimant has, as a matter of law, failed to establish that the State owed a special duty toward these children, it is not entitled to the protection of sovereign immunity with respect to the result of the SCR worker’s ministerial negligence.
Defendant’s motion for summary judgment in its favor is denied. The court declines to exercise its power to grant summary judgment in claimant’s favor (CPLR 3212 [b]) because the submissions now before us do not establish as a matter of law that the ministerial error in question was a proximate cause of the children’s injuries.

. Section 424 (6) of the Social Services Law requires that an investigation commence within 24 hours after the local CPU receives a report of suspected abuse from SCR.

. The distinction between governmental and proprietary roles is discussed at length in Miller v State of New York (62 NY2d 506, 511-512).

. Counsel also suggests that several other actions on the part of State employees, such as the direction given to Mr. Cantarano to call the County Line phone number, were also ministerial in nature. However, all of these other actions involve some degree of analysis and reasoned decision making and will not be considered further.