■ SIERRA-DAWN LA FOUNTAINE, an Infant, by TRACEY CURRIE, Her Mother and Guardian, Respondent, v NICHOLAS FRANZESE et al., Appellants. (And a Third-Party Action.) [724 NYS2d 514] —Lahtinen, J. Appeals (1) from a judgment of the Supreme Court (Teresi, J.), entered February 1, 2000 in Albany County, upon a verdict rendered in favor of plaintiff, and (2) from an order of said court, entered February 1, 2000 in Albany County, which denied defendants' motion to set aside the verdict and for a new trial.

This personal injury action seeks damages for injuries sustained by plaintiff (born in 1991) as a result of the inges-

tion, inhalation and absorption of lead-based paint chips and lead dust from April 1992 through September 1993. During this period of time, plaintiff and her family lived in an apartment owned and managed by defendants at 64B Willow Street in the City of Cohoes, Albany County. A routine pediatric examination of plaintiff in June 1992 revealed that she had an elevated level of lead in her blood of 11 micrograms per deciliter (hereinafter mg/dl).[1] Retesting in August 1992 found that the lead level in her blood had risen to 15 mg/dl, prompting notice of plaintiff's condition to third-party defendant, Albany County Department of Health (hereinafter the Department).

Plaintiff's mother testified that after a Department nurse inspected the subject apartment on September 28, 1992, she told defendant Eileen Franzese that plaintiff had elevated blood lead levels which the nurse felt came from the apartment. On October 7, 1992, a blood test disclosed that plaintiff's blood lead level had risen to 24 mg/dl, prompting the Department to do an environmental inspection of the apartment. On October 19, 1992, the Department ordered defendants to abate the lead in the apartment within 14 days. Defendants undertook the lead abatement procedures on their own and, on November 25, 1992 the Department certified that the lead hazard had been abated.

Plaintiff's blood was continually tested for lead levels which decreased for a time and then rose again. A subsequent inspection of the apartment by the Department on July 21, 1993 resulted in a July 23, 1993 order requiring defendants to perform additional lead abatement procedures which they again performed on their own. On August 13, 1993, the Department again certified that the lead hazard had been abated. Plaintiff and her family moved out of defendants' apartment in September 1993 and her blood lead levels began a gradual decline.

At the conclusion of a lengthy trial, the jury awarded plaintiff damages of $500,000 for past pain and suffering, $1,000,000 for future pain and suffering and $300,000 for future loss of earnings, apportioning liability at 70% for defendants and 30% for the Department. Defendants' and the Department's motions pursuant to CPLR 4404 to set aside the verdict were

---

**1.** According to the 1992 protocol of third-party defendant, Albany County Department of Health, an elevated blood lead level—one above the normal range of most of the population—was considered to be one that was over 10 mg/dl.

denied. Only defendants appeal from the judgment and denial of their motion to set aside the verdict.[2]

On appeal defendants argue that since, as a matter of law, they cannot be held liable for the injuries suffered by plaintiff prior to their having notice of the lead hazard existing in their apartment (see, Stover v Robilotto, 277 AD2d 801, lv granted 96 NY2d 709; Chapman v Silber, 275 AD2d 122, lv granted 96 NY2d 709), and the evidence failed to differentiate between the injuries that plaintiff suffered from lead poisoning before and after defendants had notice of the hazardous condition, they may not be held liable for any of plaintiff's injuries. Alternatively, defendants claim that Supreme Court's charge to the jury, instructing it that defendants could be held fully liable for plaintiff's injuries, was prejudicial error and this was compounded by the incorrect and improper first interrogatory in the verdict sheet which permitted the jury to find defendants liable for plaintiff's injuries from May 1992 to September 1993 and failed to account for the periods prior to their having notice of the existence of the lead hazard in the apartment. Finally, defendants argue that the damage awards were excessive and based on speculative evidence. We find these arguments to be without merit.

Proof of the existence of a lead-based hazard in the apartment, the causal relationship of that hazard to plaintiff's injuries and her damages resulting therefrom came from documentary and testimonial evidence, including the testimony of various experts. These experts established plaintiff's medical and psychological problems, including attention deficit hyperactivity disorder, oppositional defiant disorder, cognitive disorders and a reading disorder. All of the experts opined that these disorders would plague plaintiff throughout her life and were caused by lead poisoning which was directly related to the lead hazard existing in the apartment owned and managed by defendants. This evidence further established that the lead hazard came from chipping and peeling lead-based paint and lead dust in the apartment, the latter caused in large part by defendants' lead abatement procedures performed in October and November 1992 during which they failed to cover the floor and furniture with plastic, to seal off rooms in which the remediation was taking place, to wash down the work areas to remove lead dust and particles, and used an ordinary vacuum with an exhaust port rather than the special vacuum provided

---

2. As the Department did not file a notice of appeal from either the judgment or order, its appellate brief was stricken by order of this Court entered February 5, 2001.

to defendants by the Department during a portion of the abatement process.

Moreover, plaintiff's experts found that plaintiff's lead poisoning and resultant injuries could not be apportioned between prenotice and postnotice periods of exposure, but was attributable to her overall exposure. The record does reveal that plaintiff's blood lead levels were most elevated after defendants had notice of the lead hazard in November 1992 (37 mg/dl, 35 mg/dl and 36 mg/dl) and December 1992 (30 mg/dl) in the midst of and immediately following defendants' inadequate and incomplete attempt at abatement of the hazard, and remained elevated[3] after the initial abatement attempt, prompting a second abatement order from the Department in July 1993.

The courts of this State have held that injuries not capable of reasonable or practicable division are not required to be apportioned and, as a result, may be attributable in such instances to all defendants (see, e.g., Ravo v Rogatnick, 70 NY2d 305, 310; Stathis v Jamaica Hosp., 187 AD2d 499, 500; Lewis v Yonkers Gen. Hosp., 174 AD2d 611, 612). We find this legal tenet appropriate in this instance where the record is devoid of any proof which would provide the jury a nonspeculative basis upon which to make a practical division of plaintiff's injuries. Plaintiff conclusively proved that the lead poisoning which caused her injuries was properly attributable to the lead hazard in defendants' building and defendants thereafter failed to present proof which would render plaintiff's injuries "divisible" and enable the fact finder to apportion damages to separate periods of culpability (see e.g., Walker v DiPaolo, 270 AD2d 932). Accordingly, Supreme Court's denial of defendants' motion to dismiss plaintiff's case as a matter of law at the close of the proof and denial of defendants' posttrial motion seeking the same relief was proper. For the same reasons, we find no error in either the first interrogatory on the verdict sheet submitted to the jury or Supreme Court's jury charge, both of which correctly instructed the jury on the law pertaining to plaintiff's damages.

Next, we disagree with defendants that the damages awarded to plaintiff were excessive or based on speculative evidence. Rather we find that the jury's awards for pain and suffering do not materially deviate from what would be reason-

---

**3.** The laboratory report in evidence demonstrated that plaintiff's subsequent blood lead levels were the following: 22 mg/dl on February 19, 1993, 16 mg/dl on March 11, 1993, 21 mg/dl on May 28, 1993, 26 mg/dl on July 8, 1993, 22 mg/dl on July 20, 1993, 29 mg/dl on August 16, 1993 and 22 mg/dl on August 23, 1993.

able compensation for plaintiff's injuries in this instance (see, CPLR 5501 [c]; *Ordway v Columbia County Agric. Socy.*, 273 AD2d 635, 636; *Hancock v 330 Hull Realty Corp.*, 225 AD2d 365, 366) since the record is replete with expert and lay proof regarding the devastating effect that plaintiff's resulting permanent disorders had on her to the time of trial and will continue to have on her life. Plaintiff presented medical evidence from an expert pediatrician that the lead poisoning caused her to suffer attention deficit hyperactivity disorder (hereinafter ADHD), oppositional defiant disorder, a reading disorder and other cognitive disorders, all permanent conditions. Plaintiff's expert neuropsychologist also opined, after extensive testing and an evaluation of plaintiff, that plaintiff suffered from these disorders. He further testified that such disorders are associated with greatly increased rates of social problems, substance abuse, occupational and marital failures, depression, anxiety and a lower quality of life, including lower employment prospects for someone with plaintiff's level of intelligence and education. Plaintiff was also tested and evaluated by a school psychologist, upon a referral from her pediatrician and her school's Committee on Special Education, who found that she was properly classified as "other health impaired" for learning purposes and she suffered from ADHD which she would not outgrow. This witness also testified that testing and evaluation of plaintiff revealed a specific memory deficiency and significant short-term memory weakness related to sequences of symbols which profoundly affected plaintiff's reading ability.

Turning specifically to the $500,000 award for past pain and suffering, the proof shows that plaintiff, who was eight years old at the time of trial, has suffered the devastating effects of the resultant disorders from her lead poisoning since she was one year old. Her mother testified that plaintiff has little or no appetite, has a hard time sleeping as a result of the medication she must take and has terrible temper tantrums. She further stated that school is not an enjoyable experience for plaintiff because she did not do well socially in kindergarten and was repeating first grade. She indicated that plaintiff was classified by her school's Committee on Special Education as "other health impaired" and carries that stigma. She is called stupid and retarded by her classmates, is not invited to social functions such as birthday parties, and is aware of and affected by this behavior toward her, at times coming home crying from school. Additionally, the disheartening effects upon plaintiff of being a social pariah were confirmed by defendants' expert child psychiatrist who testified that during his evaluation of

plaintiff, she drew a picture where she was alone and told him that she had no friends. Clearly, the jury took into account the tender years and extreme vulnerability of plaintiff and considered that most children during their first seven years of life are unburdened by the problems faced by plaintiff and are able to fully enjoy their learning experiences, friendships and family. Additionally, plaintiff's formative years, important to the development of traits and skills she will employ throughout her life, were taken from her by the negligence of defendants. In light of the sufficient evidence presented to demonstrate plaintiff's past pain and suffering, this award cannot be said to be improper.

As to the $1,000,000 award for future pain and suffering, it is supported by an abundance of evidence, including expert testimony that plaintiff's disorders have been found to cause a myriad of permanent physical, emotional and social problems, which we do not find to be speculative or without a foundation. Clearly, the jury evaluated all the evidence, applied Supreme Court's proper instructions on the law, evaluated the long-term effects of plaintiff's disorders arising from her lead poisoning as established by the proof in light of her 70-year life expectancy, and fashioned an award for future damages which we do not find to be unreasonable.

In conclusion, we find that plaintiff's disorders and disabilities, and the lifelong difficulties which will stem from those disorders, were firmly established by plaintiff's experts (*compare*, *Arce v New York City Hous. Auth.*, 265 AD2d 281, 282, *lv denied* 94 NY2d 764) and were sufficient to leave undisturbed the jury's awards for pain and suffering, giving deference to the jury's determination as we are directed to do in these instances (*see*, *Ordway v Columbia County Agric. Socy.*, 273 AD2d 635, 636, *supra*).

Finally, we do not find the award of $300,000 for future lost earnings to be improper. We initially note that since the process of calculating such damages is beyond the general knowledge of the average juror (*see, e.g.*, *De Long v County of Erie*, 60 NY2d 296, 307; *see also*, *Testa v Seidler*, 81 AD2d 715, 716, *lv denied* 54 NY2d 607), Supreme Court did not abuse its discretion by permitting plaintiff's expert vocational economic analyst to establish future lost earnings. This expert testified that, in his expert opinion, plaintiff would be entitled to an award for future lost earnings based on her medical, psychological and educational history. He further testified that plaintiff's disabilities from the lead poisoning would not prevent her from working, but would interfere with her working. He calculated

plaintiff's projected future lost earnings, a legitimate item of damages even for an infant plaintiff (*see, Sullivan v Locastro*, 178 AD2d 523, 527, *lv denied* 81 NY2d 701), by comparing her capabilities and projected earnings working as a disabled person with the projected earnings of a nondisabled person. He opined that plaintiff's disorders would classify her as a nonseverely disabled worker under categories of workers established by the United States Department of Commerce, which took into account her average IQ despite her disabilities. He then employed other Department of Commerce statistics to contrast the average number of years that a nondisabled woman would work over a lifetime (30.9 years) with the average number of years that a disabled woman would work over her lifetime (21.6 years), used United States Department of Labor statistical data to contrast the average annual earnings of a nondisabled woman with an average learning ability intelligence range ($21,487) with that of a disabled woman with an average learning ability intelligence range ($19,500) and opined that the undiscounted value of plaintiff's future lost earnings, including inflation, was over $3,000,000. Supreme Court properly instructed the jury that the figure reached by plaintiff's expert was an estimate which it could accept or reject, and we find that while it apparently rejected plaintiff's gross figure, its actual award finds a sound basis in the record, as simple arithmetic calculations employing properly admissible statistical data issued by departments of the United States government would result in a future lost earnings figure of over $240,000. With that figure firmly established by uncontroverted data, the jury's actual award cannot be said to be improper.

Cardona, P. J., Crew III, Peters and Mugglin, JJ., concur. Ordered that the judgment and order are affirmed, with costs.