■ The People of the State of New York, Respondent, v Mark Conway, Appellant. [800 NYS2d 16]—

Judgment, Supreme Court, Bronx County (Troy Webber, J.), rendered July 3, 2001, convicting defendant, after a nonjury trial, of assault in the third degree and sentencing him to 150 hours of community service and a $1,000 fine, reversed, on the law, and the indictment dismissed.

Defendant Conway was an experienced uniformed police officer on anticrime street patrol, driving an unmarked patrol car with two other uniformed officers when they observed complainant Dantae Johnson walking with Kyle Thompson. The two individuals matched a brief description of armed perpetrators of a robbery that had occurred one block away, and were stopped

by the police for questioning.[1] Due to their suspicious behavior when stopped, the officers believed that Johnson and Thompson were carrying guns. The two individuals then split up and fled, with the other officers in pursuit on foot. At this point, Conway's supervisor directed Conway (who was still in the patrol car) to apprehend Johnson by means of the patrol car. Pursuant to those orders, Conway drove the car onto the sidewalk to block Johnson from escaping. Conway, who was left-handed, unholstered his gun at this time and held it in his left hand. As he blocked Johnson with the car, Conway pointed the gun at him and stated "police, don't move." Johnson failed to heed that command, jumped over the front portion of the patrol car and kept running down the street. Conway continued his pursuit in the car, chasing Johnson while yelling at him to stop. Conway again placed the car on the sidewalk in Johnson's path. At this point Conway switched his gun to his right hand as he positioned himself close enough to grab Johnson with his left hand.[2] Conway was holding the steering wheel and the gun in his right hand. Conway stopped the car as he grabbed Johnson's right arm near the shoulder. Johnson swung his left arm inside the car and grabbed Conway's right arm. Conway started to lose his grip and pulled harder on Johnson's arm until Johnson's jacket ripped. As Johnson pulled away, Conway fell back into the car. At that point, with Johnson only a few feet from the car,[3] Conway's gun discharged inside the car. The bullet appears to have gone through the car door and driver's side rear view mirror whereupon it struck Johnson causing extensive injuries.

Conway was charged with assault in the third degree (Penal Law § 120.00 [3]), which provides that a person is guilty when "[w]ith criminal negligence, he causes physical injury to another person by means of a deadly weapon or a dangerous instrument." Criminal negligence requires a determination as to whether the conduct which caused the injury involved a substantial and unjustifiable risk, and whether the failure to

1. The reasonableness of the stop and justification for the subsequent chase are not in dispute.

2. Conway testified that he continued to follow Johnson by car at about 10 miles per hour, against the direction of traffic as there was no traffic at that hour. He made the decision to grab Johnson at that point because he was concerned that if the pursuit continued, there was the potential for an accident.

3. At the grand jury, Johnson testified that he was 15 to 20 feet away. He also provided such information to an investigating detective. At trial, however, he admitted that he was mistaken as to the distance. Furthermore, the forensic evidence and People's witnesses established that Johnson was very close to the car, within a few feet away at the most, when the gun went off.

perceive it was such as to constitute a gross deviation from the standard of care which a reasonable person would have observed under the same circumstances (Penal Law § 15.05 [4]; *see People v Haney*, 30 NY2d 328, 335 [1972]). Moreover, "the carelessness required for criminal negligence is appreciably more serious than that for ordinary civil negligence, and . . . the carelessness must be such that its seriousness would be apparent to anyone who shares the community's general sense of right and wrong" (*People v Boutin*, 75 NY2d 692, 695-696 [1990] [citations omitted]). In addition, the defendant must have "engaged in some blameworthy conduct creating or contributing to a substantial and unjustifiable risk" (*id.* at 696).

At the nonjury trial, the court allowed Dr. Thomas Streed to testify as an expert for the People in police procedures, tactics and training, and in the use of force. Streed, a forensic psychologist who gives "forensic consultations," was a former homicide detective with the San Francisco Sheriff's Office. He claimed familiarity with the New York Police Department (hereinafter referred to as the NYPD) Patrol Guide, training manual and other materials related to training and police procedures.

Streed testified that the Patrol Guide did not prohibit an officer from chasing a fleeing pedestrian suspect by car, or from having his gun out while in such vehicle during pursuit. He also admitted that the Guide did not direct how an officer should react in this situation when separated from his partner. Streed also testified that he had not consulted with the NYPD regarding tactics employed by street crime units or how three-man teams operated. In addition, he never spoke with the supervisor in charge of the investigation. He further stated that NYPD policy and training materials advise that officers should not hesitate to unholster their firearms when they perceive life-threatening danger.

Moreover, Streed testified that he drew his conclusions based upon Johnson's original claim that he was about 15 to 20 feet away from Conway when he was shot. Streed maintained that he did not consider what had happened prior to Conway's pursuit, nor did he consider the impetus for the police action and pursuit, Conway's supervisor's direction to use the vehicle to pursue Johnson, or the radio call for assistance. Similarly, Streed did not take into account that a major function of the street crime unit was to remove guns from the street.

Furthermore, on cross-examination, it was clear that Streed had not known that Conway's patrol car was stopped when the gun went off. Finally, Streed essentially conceded that Conway's conduct could be evaluated by reference to what had happened

before the shooting, that Conway's pursuit, as well as the manner of the pursuit, was justified, and that he concluded that Conway believed Johnson was armed.[4]

Nevertheless, Streed offered his opinions as to whether Conway had acted with criminal negligence, putatively with reference to NYPD procedural and training documents. At issue and crucial to the People's case are the following opinions offered by Streed: (1) A "reasonable and prudent NYPD officer would have known or should have known that NYPD policy would not endorse the reasonableness of pursuing Dantae Johnson, a pedestrian, from a police vehicle" around midnight; (2) Conway "failed to perceive that he was creating a substantial and unjustifiable risk to both Dantae Johnson and the public and to himself"[5] by driving his car on and off the curb and sidewalk, and down a street the wrong way; (3) Conway "knew or should have known that he had increased the risk of an accidental discharge of his weapon to an even more substantial and unjustifiable level" when he transferred his gun to his weak hand and grabbed Johnson from a moving vehicle. In addition, when faced with the information that his factual assumption was wrong regarding the movement of the police car, Streed stated, without any basis, "the same criteria pertained whether the vehicle is moving or stopped."

These opinions are clearly flawed as will be addressed seriatim. The first opinion contradicts Streed's own admission that there was no prohibition in either NYPD regulations or training on the vehicular pursuit of a suspect who was on foot or upon Conway drawing his gun when he believed that Johnson was armed. In his second opinion, Streed testified as to the ultimate issue in the case. In his third opinion, Streed again offered legal conclusions regarding the ultimate issues in the case, i.e., that Conway unjustifiably increased and essentially ignored the risk of an accidental discharge. In his last opinion at issue, Streed made bald, unsupported conclusions as his factual premise was proven false.

Generally, the use and scope of expert testimony rests in the

---

**4.** In addition, Streed testified that he reviewed an SCU 1994 training manual that advised that "the most effective anti-crime teams do not pursue suspects unless absolutely necessary," however, such document was not introduced into evidence. He also testified that the training manuals advise the officers to avoid preconceived notions that a suspect falls into a criminal category simply because of race, ethnicity, grooming, speech, etc., without any evidence that the pursuing officers were motivated by other than the individual's behavior at the scene.

**5.** Streed also opined in the alternative that Conway "had a reckless disregard for the risk he was creating," a standard that is not relevant to this case.

sound discretion of the trial court (*People v Lee*, 96 NY2d 157, 162 [2001]). In a jury trial it is admissible as an aid to the jury as to matters typically beyond the jury's knowledge (*People v Hicks*, 2 NY3d 750 [2004]). When the information is beyond the jury's common knowledge, courts have been permitted expert opinion as to the ultimate issue (*id.*). Even in such circumstance, however, the leeway given is not without its limitations.

In this case, the court and the People failed to recognize that there is a difference between eliciting on the one hand testimony from the expert regarding the NYPD procedures or regulations that were implicated in this tragic chain of events, if any were violated, and how Conway's actions were or were not consistent with those requirements, and on the other hand testimony from the expert regarding the ultimate questions—whether the conduct which caused the injury involved a substantial and unjustifiable risk, and whether the failure to perceive it was such as to constitute a gross deviation from the standard of care which a reasonable person would have observed under the same circumstances. The former is clearly permissible and the latter is not (*see People v Ingram*, 2 AD3d 211, 212 [2003], *lv denied* 2 NY3d 741 [2004]). Moreover, Streed did not offer testimony that would likely be beyond the knowledge of the factfinder or was necessary to put Conway's actions into context (*see id.* at 213). Rather, the People through Streed's testimony impermissibly usurped the factfinder's role by offering opinions that Conway's conduct manifested a failure to perceive the risk of danger to Johnson and that he failed to act as a reasonable or prudent officer would under the circumstances when he pursued Johnson in a vehicle, had his gun unholstered and held onto Johnson's arm—all the ultimate issues in the case.

Furthermore, while the case was tried to the bench rather than a jury, there is no way to evaluate the impact of Streed's impermissible testimony or know how it was ultimately relied on by the court. Thus, it cannot be said that the admission of such improper evidence was harmless. Indeed, Streed's testimony is ultimately the sole evidence offered to support the People's theory that Conway acted with criminal negligence. Accordingly, without this testimony the evidence is legally insufficient.

It is uncontested that the initial stop was legal and that the officers had a reasonable basis to conclude that Johnson and Thompson were armed. Thus, Johnson was an escaping suspect and was legally pursued by Conway. Moreover, the essential facts of the chase, as narrated by Conway, are disputed only in part by Johnson and are, in fact, supported by the People's eyewitnesses and forensic evidence.

The evidence established that Conway, in lone pursuit as directed by his supervisor, and reasonably apprehensive that Johnson had a weapon which he could use at close range, justifiably unholstered his gun. Furthermore, knowing he had to end the pursuit at that point as the pursuit down the deserted street in the wrong direction might endanger others, he transferred the gun to his right hand to grab Johnson with his left hand. It is essentially undisputed that the gun accidentally discharged during the struggle at the denouement. To characterize these actions as an unreasonable gross deviation from the standard of care a reasonable officer would exercise, rising to the level of criminal negligence, would require an officer in pursuit of an apparently armed suspect to maintain a holstered gun as he struggles with the suspect at close range. Indeed, to base a finding of criminal negligence on these facts would be to impose criminality on the mere fact of an accidental discharge, which would essentially impose a standard of strict liability not encompassed by this law and completely at odds with the doctrine of criminal negligence.[6]

Thus, without Streed's testimony there simply is no evidence of criminal negligence. Nor do the facts, even as interpreted by Streed, demonstrate a gross deviation from the conduct of a reasonable officer under the circumstances. There is no question that Conway accidentally shot Johnson and that the shooting was tragic. While this failure to protect Johnson from such shooting may constitute civil negligence, the proof does not demonstrate that it meets the higher standard of criminal negligence; it does not show that Conway was engaged in any criminally culpable risk-creating conduct that gave rise or contributed to a substantial and unjustifiable risk of injury. Concur—Mazzarelli, J.P., Ellerin and Catterson, JJ.

Williams, J., dissents in a memorandum as follows: I would affirm. There is no cogent basis for overturning the trial judge's decision in this case.

The trial evidence shows that around midnight on May 25, 1999, two teenaged boys were walking in their Kingsbridge neighborhood, in the 46th Precinct, when they realized that they were being followed by an unmarked police patrol car. The officers suspected that the boys were carrying firearms and that one of them, Dantae Johnson, was carrying a firearm concealed

---

**6.** The defendant maintains that a police officer, as someone with extensive training in firearms, can never be charged with misperceiving the risk that a loaded firearm entails. While this is an interesting academic point that is a curious choice of main argument for the defendant on appeal, we decline to reach it for the reasons set forth above.

in his waistband. The suspicion as to Johnson, who was wearing the loose-fitting, falling-off-the-waist, hip-hop-style jeans popular with urban and suburban teens across America, was based exclusively upon the fact that he had been observed pulling up his pants several times. When four patrolmen exited the car and approached the boys, they took off running, Johnson tugging up his pants once more before he began to run. When the boys took off in different directions, defendant, driving the unmarked car, pursued Johnson. In his pursuit of Johnson, defendant drove the car up onto the sidewalk, then back onto the street into oncoming traffic. During the pursuit, defendant unholstered his firearm, holding it in his dominant left hand as he drove with his right. As he overtook Johnson, he shifted the weapon to his right hand, with which he continued to steer the car, and reached out of the moving car and grabbed Johnson with his left hand. According to all witnesses other than defendant, Johnson then spun *away* from the patrol car, not towards it, and did not reach into the patrol car. In any event, defendant lost control of his weapon and it discharged, severely wounding Johnson. No firearm or evidence of a firearm was recovered from Johnson or his companion and their arrests were promptly voided.

Defendant was convicted of criminally negligent assault in the third degree, a misdemeanor, after a nonjury trial, and was sentenced to a fine and community service. He appeals his conviction arguing, among other things, that expert testimony as to police tactics infringed upon the province of the factfinder and violated his right to a fair trial.

Defendant, and my colleagues, suggest that the expert testimony violated his right to a fair trial by including opinions on the ultimate issues to be determined in the case, i.e., defendant's state of mind and the degree of risk created by his actions. While the expert may have infringed, at times, on the province of the factfinder, any such error was harmless.

Initially, "the admissibility and limits of expert testimony lie primarily in the sound discretion of the trial court" (*People v Lee*, 96 NY2d 157, 162 [2001]), and the fact that it may infringe on the factfinder's province does not render the testimony per se inadmissible (*id.*; *People v Jones*, 73 NY2d 427, 430-431 [1989]; *People v Cronin*, 60 NY2d 430, 432-433 [1983]; *People v Ingram*, 2 AD3d 211, 212 n 2 [2003], *lv denied* 2 NY3d 741 [2004]). Expert testimony explaining police procedures frequently is allowed by courts (*see e.g. Williams v City of New York*, 2 NY3d 352, 367 [2004]; *People v Hicks*, 2 NY3d 750, 751 [2004]). In these cases, "[t]he guiding principle is that expert

opinion is proper when it would help to clarify an issue calling for professional or technical knowledge, possessed by the expert *and beyond the ken of the typical juror"* (*De Long v County of Erie*, 60 NY2d 296, 307 [1983] [citations omitted and emphasis added]).

Inasmuch as the case before us was not a trial before a jury, but before the court sitting as factfinder, concern about expert testimony improperly swaying lay factfinders is misplaced. "Unlike a lay jury, a Judge 'by reasons of . . . learning, experience and judicial discipline, is uniquely capable of distinguishing the issues and of making an objective determination' based upon appropriate legal criteria, despite awareness of facts which cannot properly be relied upon in making the decision" (*People v Moreno*, 70 NY2d 403, 406 [1987], quoting *People v Brown*, 24 NY2d 168, 172 [1969]). The presumption in a nonjury trial is that the presiding judge will disregard improper expert testimony, consider the evidence and reach her verdict on the basis of her own independent evaluation of the properly received evidence. The decision of the fact-finding court should be accorded great weight on appeal and should not be disturbed on sufficiency or weight-of-the-evidence grounds unless no "valid line of reasoning and permissible inferences could lead a rational person to the conclusion reached by the fact finder on the basis of the evidence at trial, viewed in the light most favorable to the People" (*People v Williams*, 84 NY2d 925, 926 [1994]; *People v Cantres*, 238 AD2d 56, 59 [1997], *lv denied* 91 NY2d 971 [1998]), or unless "based on all the credible evidence, a different finding would not have been unreasonable . . . [and if so, after duly weighing the evidence,] it appears that the trier of fact has failed to give the evidence the weight it should be accorded" (*see People v Bleakley*, 69 NY2d 490, 495 [1987]; *People v Cantres* at 60).

Neither of these situations is presented here. The bare facts of this incident, as found by the trial judge/factfinder, provide a legally sufficient evidentiary basis for the verdict, which was consistent with the weight of the evidence. The evidence as to defendant's conduct is overwhelming and speaks for itself. Nothing in the record indicates that the trial judge relied on the expert testimony; in any event, any conceivable error in admitting the expert testimony would be harmless. Defendant's conduct showed a disregard for public safety and was a gross deviation from acceptable societal norms. Even if we ignore the questionable nature of the initial determination to approach the suspects, based upon the observation of, at best, equivocal behavior, defendant's subsequent vehicular pursuit and result-

ant near-mortal wounding of the victim constituted grossly negligent misconduct.