Calvin L. WILLIAMS, as Administrator and Personal Representative of the Estate of Annie Joyce Williams, Deceased, Plaintiff,

v.

CITY OF MONTGOMERY, ALABAMA and Kevin Murphy, individually and in his capacity as an officer of the Montgomery Police Department, Defendants.

Civil Action No. 98–A–361–N.

United States District Court,
M.D. Alabama,
Northern Division.

April 22, 1999.

Charles H. Volz, III, Volz, Prestwood & Hanan, PC, Montgomery, AL, for Calvin L. Williams.

George B. Azar, Elizabeth C. Wible, Azar & Azar, Montgomery, AL, F. Tim McCollum, City Attorney, Montgomery, AL, for The City of Montgomery, Kevin Murphy.

## MEMORANDUM OPINION

ALBRITTON, Chief Judge.

### I. *INTRODUCTION*

This cause is before the court on two Motions for Summary Judgment. The first was filed by Defendant Kevin Murphy ("Detective Murphy") on January 25, 1999 (Doc. # 34). A Response, styled "Plaintiff's Statement in Opposition to Motion for Summary Judgment of the Defendant, Kevin Murphy" was filed by Plaintiff Calvin L. Williams ("Williams" or "Plaintiff") on March 18, 1999 (Doc. # 55). Detective Murphy's Reply, styled "Defendant Kevin Murphy's Reply to Plaintiff's Statement, Filings, and Argument Opposing His Motion for Summary Judgment," was filed on April 1, 1999 (Doc. # 62).

The second motion was filed by Defendant City of Montgomery (the "City") on March 4, 1999 (Doc. # 46). Plaintiff Williams filed his Response, styled "Plaintiff's Opposition to Motion for Summary Judgment of the Defendant, City of Montgomery, Alabama," on March 27, 1999 (Doc. # 59). The City filed its Reply, styled The City's Reply to Plaintiff's Opposition to the City's Motion for Summary Judgment, on April 2, 1999 (Doc. # 65).

Williams' Second Amended Complaint alleged six counts against Detective Murphy and the City of Montgomery.[1] Detec-

---

1. The six counts alleged included state law claims for negligence and/ or wantonness and breach of statutory duty in Counts I and II, and section 1983 claims for deprivation of federal Constitutional rights under color of state law for failure to provide Equal Protec-

tion in Counts III and IV, negligent training leading to a violation of Equal Protection in Count V and violation of substantive due process and the "right to protection" in Count VI. In its October 16, 1998 Order, the court dismissed Count VI, found that Count V did

tive Murphy moves for summary judgment on the two remaining counts against him: state law claims for negligence and/ or wantonness for failing to protect the plaintiff and breach of statutory duty. Detective Murphy alleges that the claims are due to be dismissed because he is protected by state law discretionary function immunity. The City moves for summary judgment on all remaining counts against it: two state law claims for negligence and breach of statutory duty, and three § 1983 claims for violation of the Fourteenth Amendment for the failure to provide equal protection to women and to victims of domestic violence, and for a training policy which failed to provide adequate training to protect these groups' rights to equal protection.

For the reasons to be discussed, Detective Murphy's Motion is due to be granted, and the City's Motion is due to be granted in part.

## II. *FACTS*

The submissions of the parties establish the following facts:

Plaintiff Williams brings this case as Administrator and Personal Representative of the estate of Annie Joyce Williams ("Ms.Williams"). During her lifetime, Ms. Williams had a relationship with and was married to David Lee Long ("Long"). Throughout the relationship and marriage, and following the dissolution of the marriage, Long harassed, threatened and physically abused Ms. Williams.

The Montgomery Police Department ("MPD") had knowledge of Long's pattern of violent behavior toward Ms. Williams and her family. On several occasions, Ms. Williams and members of her family filed charges against Long with the MPD. The

MPD also responded to several 911 calls from Ms. Williams' residence requesting assistance because of threatened and actual domestic violence by Long against Ms. Williams.

For example, on March 28, 1994, Ms. Williams complained to the MPD that Long slapped her around, choked her, bruised her, threatened her life, and forced her to have sex with him. *See* Pl.'s 2d Resp.,[2] Ex. 2–G, 3/28/94 Complaint. Williams alleges that this evidence was sufficient to require the issuance of a warrant and/ or an investigation of Long for the offense of Rape in the First Degree. *See* Pl.'s 2d Resp., Ex. 15, Johnson Dep. at 115–17. Williams alleges, however, that a MPD detective informed Ms. Williams at that time that she could only obtain a misdemeanor charge of Assault in the Third Degree because of her relationship with Long. *See* Pl.'s 2d Resp., Ex. 7., Rosie M. Williams Aff. at 1–2. Williams alleges that the treatment of this complaint provides a typical example of the MPD's dismissive treatment of Ms. Williams' complaints.

When Ms. Williams met with Detective Ward, who is now deceased, regarding the March 28, 1994 incident, Detective Ward referred her back to Patrick Rankins, a Municipal Court Magistrate, to file an assault claim against Long. *See* City's Br., Att. 6, Rankins Aff. ¶ 7. John Wilson, Chief of the MPD, states that, based on MPD policies in effect at the time and on the training that Detective Ward received, Detective Ward would not have referred Ms. Williams back to the Magistrate to file a charge of assault in the third degree unless Ms. Williams had stated that she did not want to pursue a rape charge. *See* City's Br., Att. 2, Wilson Aff. ¶ 9. On May

---

not state a claim against Detective Murphy, and found that Detective Murphy was entitled to qualified immunity from Counts III and IV.

**2.** "Pl.'s 2d Resp." refers to Plaintiff's Opposition to Motion for Summary Judgment of the Defendant, City of Montgomery, Alabama. "Pl.'s 1st Resp." refers to Plaintiff's Statement

in Opposition to Motion for Summary Judgment of the Defendant, Kevin Murphy. "City's Br." and "City's Reply" refer to the City's briefs, and "Murphy's Br." and "Murphy's Reply" refer to Detective Murphy's briefs.

26, 1994, in accordance with the City's standard procedures, the Municipal Judge dismissed the March 1994 misdemeanor assault charge against Long because Ms. Williams twice failed to appear as a witness. *See* City's Br., Att. 3 ¶ 4 and Ex. A.

On or about September 16, 1995, Anthony Williams, Ms. Williams' brother, filed a formal complaint with the MPD charging that Long had fired a pistol at Ms. Williams and him. On the basis of Anthony Williams' affidavit, a warrant for Long's arrest was issued on a charge of reckless endangerment. On or about October 10, 1995, Ms. Williams filed a formal complaint against Long with the MPD charging that Long struck Ms. Williams with a pistol, caused physical injury to her and to a minor child, and made repeated threats to kill her. Based on this complaint, a misdemeanor warrant for Long's arrest was issued on a charge of assault in the third degree. Another individual who was threatened by Long with a pistol during the course of Long's assault on Ms. Williams also complained to the MPD, and an additional criminal charge of menacing was brought against Long.

On December 12, 1995, following a trial in the Municipal Court of Montgomery County, Long was convicted of three misdemeanor charges. Long was fined and sentenced to a period of incarceration; however, Long appealed the convictions and was released on bond pending a hearing on his appeal. Long was released from jail without notice to Ms. Williams or her family. Plaintiff also alleges that the bond amount was insufficient to provide protection for Ms. Williams and the public, that the City failed to take reasonably necessary steps to prevent Long from possessing a firearm, and that the City failed to provide for the revocation of bond in the event of Long's possession of a firearm during his period of release.

In conjunction with some of the events for which formal charges were filed, the MPD responded to several 911 calls from Ms. Williams' residence. Between September 16, 1995 and October 15, 1995, six 911 emergency calls were placed from Ms. Williams' residence. *See* Pl.'s 2d Resp., Ex. 10, 1. One of the calls reported a break-in, another reported a burglary, three involved threatened violence involving Long,[3] and one call reported an actual assault on Ms. Williams by her husband. *See id.*

MPD officers were dispatched to Ms. Williams' residence at those times in accordance with the priority given each call by the 911 operator and MPD procedures. The MPD alleges that its officers are trained to respond as quickly or more quickly to domestic violence disturbance calls than to general disturbance calls. *See* City's Br., Att. 2, Wilson Aff. ¶ 6. The City alleges that the MPD officers who responded to the threatened domestic violence calls neither saw Ms. Williams and Long together nor witnessed Long commit any crimes against Ms. Williams. *See* City's Br., Att. 7, Steelman Aff. ¶¶ 4–5. In accordance with City policy and training, because the officers did not witness the alleged misdemeanor crimes and the accused was not present, the officers advised Ms. Williams and other witnesses to speak with a Warrant Clerk and complete an affidavit/complaint. *See* City's Br., Att. 2, Wilson Aff. ¶ 7. When MPD officers responded to the 911 calls which involved domestic violence, in accordance with MPD policies, they did not complete written reports describing the alleged incidents of domestic violence pursuant to the requirements of Ala.Code § 15–10–3(c).

After the October 10, 1995 assault, Ms. Williams sought protection at a shelter for battered women. A week later, she filed for a divorce, and on October 18, 1995, a Temporary Restraining Order was issued by the Circuit Court of Montgomery County, enjoining Long from "harming, molest-

---

**3.** Long's name does not appear in the MPD documents regarding the resultant service calls. It is unclear whether his name was given to the MPD officers at the scene.

ing, abusing, threatening, communicating or annoying [Ms. Williams] in any manner, directly or indirectly." Despite this order, Long made threats to kill Ms. Williams during his release. On February 5, 1996, the Restraining Order was made permanent as part of a Final Decree of Divorce. According to her mother, Ms. Williams carried a copy of the restraining order with her, folded in a Bible in her purse, at all times. *See* Pl.'s 1st Resp., Ex. 7, Rosie M. Williams Aff. at 2.

Thereafter, Long continued and intensified his pattern of harassing, stalking and threatening Ms. Williams, and on February 12, 1996, she went to the MPD to seek protection from Long. She initially met with Ola Belle Johnson, a City Magistrate/Warrant Clerk ("Ms.Johnson"). Ms. Johnson observed that during their meeting Ms. Williams was shaking, crying, nervous and upset, and that it took a few minutes for Ms. Williams to compose herself before filling out the misdemeanor warrant. *See* Pl.'s 1st Resp.Ex. 5, Johnson Dep., at 47.

Ms. Williams' affidavit explains that Long sat next to her at church on February 11, 1996, that he was "just talking about crazy things," and that after she had gone to visit the sick and shut in, Long asked her to ride back with him, but that she said no. *See* Pl.'s 1st Resp.Ex. 1 at 2. The affidavit further provides that Long called Ms. Williams on February 12, 1996, informed her that he had been following her, and told her "that the next time he see me he just are going on ahead and kill me, because if he can't have me no one can, and we just die together." *Id.* at 3.

Ms. Johnson testified at deposition that Ms. Williams stated that Long had made several threats on her life and that Ms. Williams told her about the protective order during the February 12, 1996 interview. *See* Pl.'s 1st Resp.Ex. 15, Johnson Dep. at 38–40, 47. Ms. Johnson checked Long's prior criminal arrest record on her computer during the meeting with Ms. Williams. *See* Pl.'s 1st Resp.Ex. 15, John-

son Dep. at 47, 53–54. Long's criminal record included misdemeanor arrests for assault, menacing, reckless endangerment, and violation of a family violence order; Ms. Williams was the complainant for most of the arrests. *See id.;* Pl.'s 1st Resp.Ex. 4. Based upon the information provided by Ms. Williams, including the written affidavit, the existence of the protective order, and a review of Long's arrest record, Ms. Johnson found probable cause and issued a misdemeanor warrant for the arrest of Long on the charge of violation of the Family Violence Protection Order Enforcement Act. *See* Pl.'s 1st Resp.Ex. 1 at 2; Ex. 15, Johnson Dep. at 38–40.

Because Ms. Johnson did not have the authority to issue a felony arrest warrant on her own, she advised Ms. Williams to speak with a detective concerning a stalking warrant in accordance with MPD policies. *See* Pl.'s 1st Resp., Ex. 15, Johnson Dep. at 57, 103. Ms. Williams spoke with Detective Murphy, a shift supervisor in the MPD detective division, at approximately 7:00 p.m. that evening. Ms. Williams told Detective Murphy that her ex-husband Long had been talking crazy to her, that he had told her at church on February 11, 1996 that he could not live without her and wanted to get back together and threatened her life, that he had called earlier that same day to tell her that he had been following her and that if he could not have her, no one would, and that the next time he saw her he was going to kill her and himself. *See* Murphy's Ex. A, Murphy Aff. at ¶ 10; Pl.'s Ex. 16, Murphy Dep., at 64.

During their brief meeting, Ms. Williams told Detective Murphy that she had a restraining order against Long and that she had met with a Municipal Magistrate and signed a misdemeanor warrant charging Long with a violation of the Family Violence Domestic Relations Act. *See* Murphy's Ex. A, Murphy Aff. ¶ 12. Detective Murphy checked whether any other outstanding warrants for Long's arrest had been issued and found none. *Id.* at ¶ 14.

Detective Murphy states that he told Ms. Williams, in light of the restraining order, that the evidence might support a charge of aggravated stalking. *Id.* Detective Murphy did not ask to see a copy of the restraining order, but he told her that it would be the case agent's responsibility to review and verify the restraining order with the district court records during the investigation. *Id.* Williams notes, however, that Detective Murphy admits that there is no written requirement of a certified copy of the restraining order for the issuance of a felony arrest warrant. *See* Pl.'s 1st Resp., Ex. 16, Murphy Dep. at 32–33.

Detective Murphy explained the investigation process to Ms. Williams and told her that a detective would need to take a statement from her and a corroborating witness and that the investigation might take a few hours. *See* Murphy's Ex. A, Murphy Aff. ¶¶ 11, 13. Detective Murphy asked Ms. Williams if she had a safe place to stay that night and if she could return the following morning. *Id.* ¶ 13. Ms. Williams told Detective Murphy that she could stay at her mother's. *Id.* He encouraged her to do so, told her to return at 8:00 a.m. the following day, gave her his name, and wrote Sgt. Hudgins'[4] name on a piece of paper for her. *Id.*

Finally, Detective Murphy's Affidavit states:

> Ms. Williams never told me that she did not want to or could not come back in the morning, that she feared she could not be safe through the night, or that she wanted something done right away that night. If she had told me any of those things or anything else that had conveyed any sense of urgency to me, I would have started an investigation right away rather than asking her to return in the morning.

*Id.* ¶ 15. Detective Murphy admitted at deposition that, in retrospect, there was

sufficient probable cause to support the issuance of a felony stalking warrant on the evening of February 12, 1996. *See* Pl.'s 1st Resp., Ex. 16, Murphy Dep., at 66. Detective Murphy noted, however, that the MPD investigates felony charges because "when somebody's accused of a felony, it's important to have something to support it other than just an accusation. It's a serious charge." *Id.* at 72.

Ms. Williams did not return to the MPD. Detective Murphy states that Calvin Williams, Ms. Williams' brother, told him in a February 16, 1996 telephone conversation that Ms. Williams did not return to the MPD because she could not find a ride to police headquarters. *See* Murphy's Ex. A, Murphy Aff. ¶ 18. Ms. Williams' mother, however, alleges that Ms. Williams did not return to the police station because Ms. Williams said they had done nothing to help her and she saw no reason to return. *See* Pl.'s 1st Resp., Ex. 7, Rosie M. Williams Aff., at 2 ¶ 6.

The misdemeanor warrant issued as a result of Ms. Williams' February 12, 1996 complaint was never served, although the City maintains that proper MPD procedures regarding the service of misdemeanor warrants were followed. Pursuant to that procedure, the second shift patrol officers for the district where the suspect resides take new misdemeanor warrants on patrol with them three times. *See* City's Att. 2, Wilson Aff. ¶ 10. The warrant is served if time permits. *See id.* If the warrant is not served, it is kept on file at the MPD headquarters to be served in case of subsequent contact between an MPD officer and the suspect. *Id.* Additional attempts to serve the warrant are made if a citizen requests them. *Id.*

The misdemeanor warrant issued for the violation of Ms. Williams' restraining order was taken out on patrol on February 13, 14, and 15, 1996. *See* Pl.'s 2d Resp., Ex. 5,

---

4. Sgt. Hudgins was the first shift detective supervisor for the MPD at that time. *See* Murphy's Br., Ex. A, Murphy Aff. ¶ 13.

Warrant Card. The notation on the "warrant card" indicates that service was not attempted on February 13 or 14, and that on February 15, service was attempted but that the suspect was "not at home." *Id.* Plaintiff, however, submits evidence to contradict the MPD's allegation that service of the warrant was attempted on February 15, 1996. Long resided with his grandmother, Emma Taylor, February 12–16, 1996. An affidavit signed by Long's grandmother states that she "was home all day and all night on Thursday, February 15, 1996," that she "never left the house," and that "no policeman ever came to my home at any time on February 15, 1996." Pl.'s 2d Resp., Ex. 17, at 2.

On February 16, 1996, four days after Ms. Williams' last complaint to the MPD, Long shot and killed Ms. Williams.

### III. *SUMMARY JUDGMENT STANDARD*

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323, 106 S.Ct. 2548. The movant can meet this burden by presenting evidence showing that there is no dispute of material fact, or by showing, or pointing out to, the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322–24, 106 S.Ct. 2548.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. 2548. To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor. *Anderson v. Liberty Lobby,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is *** entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c).

### IV. *DISCUSSION*

#### A. *Detective Murphy—Discretionary Function Immunity*

As a peace officer of the state of Alabama, Detective Murphy is entitled to the discretionary function immunity provided by Ala.Code § 6-5-338(a) (Supp.1997). The discretionary function immunity statute provides, in relevant part:

Every peace officer ... who is employed or appointed pursuant to the Constitution or statutes of this state, whether appointed or employed as such peace officer by the state or a county or municipality thereof, or by an agency or institution, corporate or otherwise, created pursuant to the Constitution or laws of this state and authorized by the Constitution or laws to appoint or em-

ploy police officers or other peace officers, and whose duties prescribed by law, or by the lawful terms of their employment or appointment, include the enforcement of, or the investigation and reporting of violations of, the criminal laws of this state, and who is empowered by the laws of this state to execute warrants, to arrest and to take into custody persons who violate, or who are lawfully charged by warrant, indictment, or other lawful process, with violations of, the criminal laws of this state, shall at all times be deemed to be officers of this state, and as such shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties.

Ala.Code § 6–5–338(a).

■ The Alabama Supreme Court has recently noted that "[t]his section extends discretionary function immunity to municipal police officers ... unless the officer's conduct is so egregious as to amount to willful or malicious conduct or conduct engaged in bad faith." *Couch v. City of Sheffield*, 708 So.2d 144, 153 (Ala.1998). The theory underlying this "bad faith exception" to discretionary function immunity is that conduct carried out maliciously or in bad faith is never carried out on behalf of the municipality, but rather, on behalf of the actor's self interest.

Detective Murphy argues that because no evidence has been produced to support that his conduct was willful, malicious, or in bad faith, discretionary function immunity entitles him to judgment as a matter of law. Plaintiff Williams argues that Detective Murphy's actions were not within his lawful discretion and that, even if Detective Murphy's actions were discretionary, they fall within the bad faith exception to the discretionary function immunity doctrine.

As Detective Murphy's status as a municipal police officer is undisputed, the court analyzes the facts presented under Ala.Code § 6–5–338(a) as interpreted by the cases. The first step in the analysis requires a determination of whether Detective Murphy was engaged in a discretionary function. *See Sheth v. Webster*, 145 F.3d 1231, 1238 (11th Cir.1998). If the court finds that Detective Murphy's decision to postpone the commencement of the investigation of Ms. Williams' complaints from 7:00 p.m. on February 12, 1996 until 8:00 a.m. on February 13, 1996 was a discretionary function, the burden shifts to Plaintiff Williams to demonstrate that Detective Murphy acted in bad faith, with malice, or with willfulness in order to deny him immunity. *Id.* at 1238–39.

### 1. *Discretionary Function*

■ "Discretionary functions" are "those acts as to which there is no hard and fast rule as to the course of conduct that one must or must not take and those acts requiring exercise in judgment and choice and involving what is just and proper under the circumstances." *Id.* at 1239 (quoting *Wright v. Wynn*, 682 So.2d 1, 2 (Ala.1996)). The court found in its October 16, 1998 Memorandum Opinion that police detectives like Detective Murphy have discretion to determine whether to investigate, whether to issue warrants, and whether to issue particular types of warrants. It also appears to the court that Detective Murphy's decision to postpone the investigation of Ms. Williams' felony stalking claims overnight was within his discretion.

Williams requests that the court reconsider its conclusion that Detective Murphy was exercising a discretionary function when he decided not to immediately issue a felony warrant for the arrest of Long and not to take further action to protect Ms. Williams on the evening of February 12, 1996. Plaintiff Williams argues that when an individual is under a legal duty to act, as mandated by statute, law or ordinance, then a determination not to act in conformity with the statute, law or ordi-

nance cannot be considered as a discretionary act.

Plaintiff Williams finds a legal duty to act on the part of Detective Murphy in a Montgomery City Ordinance which provides, inter alia, that duties of members of the police force include: to use their best efforts to prevent the commission of offenses against the laws of the State and the ordinances and regulations of the City, to observe and enforce these provisions, to detect and arrest offenders, and to secure the inhabitants of the City from violence. Montgomery, Ala.Code § 32–4 (1980). Plaintiff Williams notes that, among the laws Detective Murphy had a duty to enforce are the Alabama statutes criminalizing stalking and providing special protections to victims of domestic violence. *See* Ala.Code §§ 13A–6–90; 15A–10–3(a); 30–5A–1; 30–5–1(b).

The court, however, after reading and analyzing the relevant statutes and ordinances, cannot find that the provisions create an affirmative duty for a police detective to take immediate action to arrest a suspect or to protect the complainant where domestic violence or stalking is reported. For example, Ala.Code § 15–10–3(a)(8) provides that:

> [a]n officer *may* arrest a person without a warrant, on any day and at any time ... [w]hen the officer has reasonable cause to believe that a felony or misdemeanor has been committed by the person arrested in violation of a protection order issued by a court of competent jurisdiction.

Ala.Code § 15–10–3(a)(8) (emphasis added).

The Family Violence Protection Order Enforcement Act also permits warrantless arrests:

> A peace officer *may* arrest any person for the violation of this chapter if the officer has probable cause to believe that the person has violated any provision of a valid protection order, whether temporary or permanent, which has been served on the person or of which the person has received sufficient notice that the protection order has been issued. The officer *may* arrest the person without a warrant although he or she did not personally see the violation. Knowledge by the officer of the existence or contents of, or both, or presentation to the officer by the complainant of, a protection order shall constitute prima facie evidence of the validity of the order.

Ala.Code § 30–5A–4 (emphasis added).

The court notes that while immediate action in circumstances where the complainant fears immediate harm might further the purposes of the statutes and ordinances cited by Plaintiff Williams, such immediate action is not required by the statutes. The terms of the statutes are discretionary—providing that an officer "may" take immediate action, and the statutes do not create a mandatory duty. The provisions merely allow a police officer to take immediate action to arrest a suspect if, in the exercise of the police officer's discretion, circumstances warrant such immediate action. Detective Murphy was simply not under a statutory duty to take immediate action.

Plaintiff Williams also contends that "special circumstances," as identified by Alabama common law, created a duty for Detective Murphy to take immediate action to have Long arrested or to otherwise protect Ms. Williams. In support of this contention, Williams refers the court to *Thetford v. City of Clanton*, 605 So.2d 835 (Ala.1992), *City of Birmingham v. Benson*, 631 So.2d 902 (Ala.1993), and three New York cases cited in *Benson*. The court, however, finds these cases distinguishable from the present case.

In *Thetford*, the Alabama Supreme Court, discussing innkeeper's liability,[5] re-

---

5. The Alabama Supreme Court quoted a general rule regarding innkeeper liability from 40

Am.Jur.2d Hotels, Motels and Restaurants § 112 (1968):

versed the summary judgment granted to a hotel manager who cut the chain on a female guest's hotel room door to allow her abusive husband's entrance. 605 So.2d at 838–41. The court found material questions of fact regarding whether the manager had knowledge that the woman was hiding from her husband and whether her death, approximately seven hours later, was foreseeable. *Id.* at 840–41. The innkeeper's rule, however, is simply inapplicable to Detective Murphy. In the present case, Detective Murphy neither provided accommodations to Ms. Williams nor informed Long where Ms. Williams was staying. Nor did Detective Murphy assist Long to illegally enter her accommodations. Rather, Detective Murphy checked with Ms. Williams to be sure she had a safe place to stay and encouraged her to spend the night there.

In *Benson,* an off-duty police officer who was working, in uniform, as a security guard at a bar, was held liable for the death of a bar patron. 631 So.2d 902, 903–04. The officer escorted the patron and his friends to their car, but returned inside the bar despite knowledge that another group had left the bar and was chasing down the patron. *Id.* The police officer did not appeal the jury verdict, and the Alabama Supreme Court's analysis focused on whether the City of Birmingham was entitled to substantive immunity, whether the police officer was acting as an agent of the municipality, and whether the beating death of the bar patron by a third person was an unforeseeable, intervening act. *Id.* at 904. The New York cases cited in *Benson* also focus on municipal liability based on a special relationship, not on the individual liability of the police officer. *See Julmis v. City of New York,* 194

A.D.2d 522, 598 N.Y.S.2d 312 (1993); *Sorichetti v. City of New York,* 65 N.Y.2d 461, 492 N.Y.S.2d 591, 482 N.E.2d 70 (1985); and *De Long v. Erie County,* 60 N.Y.2d 296, 469 N.Y.S.2d 611, 457 N.E.2d 717 (1983).

The issue as to Detective Murphy is whether he was performing a discretionary function, not whether the City could be liable for his negligence, if any, in the performance of his duties. Even if the court were to assume that a "special relationship" existed between Ms. Williams and the City, the court could not find that Detective Murphy's actions were somehow rendered non-discretionary by that relationship.

The court is unpersuaded by Plaintiff Williams' non-discretionary function arguments. As noted by the Chief of the MPD, the decisions about "whether and when to assign felony complaint[s] to detectives for investigation are decisions guided by the circumstances of each case and by the sense of urgency those circumstances impart to the supervisor." Murphy's Resp., Att. 13, 2d Aff. of Chief John H. Wilson ¶ 6. The court finds that Detective Murphy's decision to begin the investigation of Ms. Williams' felony stalking complaints on the morning of February 13, 1996 instead of on the evening of February 12, 1996, to have been made within his discretion as a police detective supervisor.

### 2. *No Exception Applicable*

■ The second step in the discretionary function immunity analysis shifts the burden to Plaintiff Williams to demonstrate that Detective Murphy acted willfully, out of malice, or in bad faith in order to deny discretionary function immunity. *Id.*

A proprietor of an inn, hotel, restaurant, or similar establishment is liable for an assault upon a guest or patron by another guest, patron, or third person where he has reason to anticipate such assault, and fails to exercise reasonable care under the circumstances to prevent the assault or interfere with its execution. Conversely, he is not liable for an assault committed under such circumstances that it could not reasonably have been anticipated in time to prevent the occurrence.... An innkeeper who failed to protect a guest after having been expressly warned by him of the possibility of an assault by another guest has been held liable therefor.

*Thetford,* 605 So.2d at 839.

Plaintiff alleges that Murphy's failure to act immediately was willful, malicious and undertaken in bad faith. Detective Murphy, however, argues that Plaintiff Williams has not produced any evidence that would show, or even allow an inference, that Detective Murphy acted willfully, maliciously, or in bad faith. Therefore, Detective Murphy argues, the bad faith exception to discretionary function immunity is inapplicable, and the claims against him are due to be dismissed.

Detective Murphy has introduced evidence that at or around 7:00 p.m. on February 12, 1996, he spoke with Ms. Williams, discussed an investigation for the issuance of a felony stalking warrant, asked her whether she had a safe place to stay for the night, encouraged her to stay there, and asked her to return at 8:00 a.m. the following morning to commence a felony stalking investigation. He also states that:

> Ms. Williams never told me that she did not want to or could not come back in the morning, that she feared she could not be safe through the night, or that she wanted something done right away that night. If she had told me any of those things or anything else that had conveyed any sense of urgency to me, I would have started an investigation right away rather than asking her to return in the morning.

This evidence shows a complete absence of any willfulness, maliciousness, or bad faith on the part of Detective Murphy in addressing Ms. Williams' complaint.

Plaintiff Williams contends that Detective Murphy's failure to take affirmative steps to arrest Long and protect Ms. Williams on the evening of February 12, 1996 rises to the level of willful behavior because Detective Murphy was made aware of facts from which he knew or should have known that Ms. Williams was in imminent peril and that she would be injured if he did not take immediate action. Indeed, Plaintiff concludes that "a disputed question of fact exists as to whether or not Murphy knew that his omissions—his total failure to act—would likely result in injury to [Ms. Williams] at the hands of David Lee Long." Pl.'s 1st Resp. at 31.

It simply could not be found by a reasonable jury that Detective Murphy knew or should have known that his actions on the evening of February 12 would result in injury to Ms. Williams when the evidence is that Detective Murphy told Ms. Williams to come back the next morning to process the felony warrant, she was not harmed during the night, she never went back to process the felony warrant, and her murder was four days later. For aught that appears to the court, a felony warrant would have been issued if Ms. Williams had returned the next morning as requested.

■ The court cannot discern a question as to whether Murphy knew or should have known that his failure to act immediately would likely result injury to Ms. Williams. Even assuming, however, that Detective Murphy knew that an injury to Ms. Williams was likely to occur because of his inaction, such knowledge is not enough to show that Detective Murphy acted willfully, maliciously, or in bad faith. " 'Wilfulness' is the conscious doing of some act or omission of some duty, under knowledge of existing conditions accompanied with a design or purpose to inflict injury." *Reed v. Brunson,* 527 So.2d 102, 119 (Ala.1988). Legal malice may be defined as "the intentional doing of a wrongful act without just cause or excuse, either with an intent to injure the other party or under such circumstances that the law will imply an evil intent." *Empiregas, Inc. v. Feely,* 524 So.2d 626, 628 (Ala.1988). "Bad faith," as defined by Black's Law Dictionary and adopted by the Alabama Supreme Court, "contemplates a state of mind affirmatively operating with furtive design or ill will." *In re Sheffield,* 465 So.2d 350, 359 (Ala.1984).

■ Plaintiff Williams has not submitted any evidence from which a reasonable

jury could infer that Detective Murphy's failure to take immediate action was done with the design or intent of injuring Ms. Williams. Rather, the evidence before the court shows that Detective Murphy expressed concern for Ms. Williams' safety by encouraging her to stay someplace other than her own home that night and by asking her to return early the next morning to initiate a felony investigation. At most, a jury might reasonably infer that Murphy was negligent under all the circumstances, and negligence is not sufficient to impose liability, because of Alabama's discretionary function immunity. Detective Murphy, therefore, is entitled to discretionary function immunity, and to judgment as a matter of law on the remaining claims against him in his individual capacity (Counts I and II).

### B. *The City*

#### 1. *Section 1983 Equal Protection Claims*

Section 1983 affords relief to individuals who have been deprived of a constitutional right by an individual who was acting under color of state law. *Lowe v. Aldridge*, 958 F.2d 1565, 1569 (11th Cir.1992) (citing *Flagg Brothers, Inc. v. Brooks*, 436 U.S. 149, 156–57, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978)). Plaintiff Williams brings two types of equal protection challenges: (1) that a written policy of the MPD facially discriminates against victims of domestic violence, and (2) that MPD officers, applying unwritten MPD policies, denied Ms. Williams equal protection of the law because of her status as a victim of domestic violence.

#### a. *Written Policy—Section 1.580*

Williams alleges that, on its face, Section 1.580 of the MPD Rules and Regulations Manual, "Domestic Abuse/ Family Violence Arrest Policy," ("section 1.580") discriminates against victims of domestic violence, some eighty-five percent of whom are women. *See* Pl.'s 2d Resp. at 46. That section provides, in relevant part:

where a misdemeanor arrest is necessary, and the injured party cannot or refuses to sign the warrant, officers may make an arrest based on probable cause for acts committed outside their presence. In such instances, the following procedures will be adhered to:

\* \* \*

b. Alabama rules of evidence has [sic] specific requirements in order for the statements of the victim and/ or defendant to be admissible. Members will ensure that:

1. Prior to questioning, both the defendant and the victim receive the standard Miranda warning.

2. In order to be admissible, statements must be made in the presence of the defendant and the victim. For this reason, both the defendant and the victim must be present when they are questioned, and should not be separated. The affidavit should specify what the defendant and the victim say and that it was said in each other[']s presence.

Section 1.580.

 The rule does not facially discriminate on the basis of gender. Absent a facial gender-based classification, a statute can be struck down only if it has a discriminatory purpose or a history of discriminatory application. *See Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 273–75, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979) (facially gender-neutral statute allowing state hiring preference for veterans did not offend equal protection because it was not enacted for the purpose of discriminating against women). Williams has not, however, presented any evidence that the rule has a discriminatory purpose or a history of discriminatory application against women. The rule, therefore, does not discriminate on the basis of gender.

 Williams notes, however, that in certain circumstances, this rule requires

unequal treatment of domestic violence victims. Detective Murphy agreed that, pursuant to this rule, victims of domestic violence were treated differently than victims of non-domestic violence. *See* Pl.'s 2d Resp., Ex. 16, Murphy Dep. at 121. While this rule was never applied to Ms. Williams, Plaintiff alleges that it supports a finding that the MPD intentionally discriminated against victims of domestic violence as of February 1996 by intimidating them by reading them their *Miranda* rights and keeping their aggressors present during questioning.

Unless a classification warrants some form of heightened review because it jeopardizes exercise of a fundamental right or categorizes on the basis of an inherently suspect characteristic, the Equal Protection Clause requires only that the classification rationally further a legitimate state interest. *See Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439–41, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). The difference in treatment required by section 1.580 is justified, therefore, if it is rationally related to a constitutionally permissible state purpose. *See Railway Express Agency, Inc. v. New York*, 336 U.S. 106, 69 S.Ct. 463, 93 L.Ed. 533 (1949).

Detective Murphy states that the purpose of the rule is to prevent an aggressor from pretending to be a victim when an officer arrives on the scene and escaping justice by the exclusion of evidence based on the officer's failure to give *Miranda* warnings. *See* City's Reply, Att. 8, Murphy Dep. at 117, ll. 11–21. The rule is applicable only in instances "where a misdemeanor arrest is necessary, and the injured party cannot or refuses to sign the warrant," and the officer finds it necessary to make an arrest for acts committed outside of the officer's presence. *See* section 1.580. In addition to Detective Murphy's testimony regarding the purpose of the rule, the court finds that the self-limiting language of the rule, which permits application in only a narrow set of circumstances, shows that the rule's purpose is to

help victims of domestic violence by facilitating the warrantless arrest of aggressors in domestic violence cases and by safeguarding the admissibility of statements made by aggressors. Williams' attack on the facial constitutionality of section 1.580, therefore, must fail. The court finds that section 1.580 is rationally related to the legitimate state interest of protecting victims of domestic violence.

Williams also objects to two other provisions of section 1.580. Specifically, Williams complains that section 1.580–3 provides that arrests in cases involving domestic violence should be viewed "as a last resort" and that warrantless arrests in domestic violence cases can be made only with the authorization of a shift supervisor. The court, however, finds Williams' understanding of section 1.580–3 to be inaccurate. First, the rule specifically provides that "[a]rrests should be viewed as a last resort, *just as they should be with any citizen.*" Section 1.580–3 (emphasis added). Williams has not presented any evidence that this general policy statement is untrue, and the court cannot discern any denial of equal protection for domestic violence victims from an even-handed policy treating arrest as a last resort in all situations.

Second, the warrantless arrest provision of section 1.580–3 provides that, "[i]f an incident of domestic abuse indicates that evidence exists that would justify an arrest under the warrantless arrest law, or by the victim, the Shift Commander may authorize the responding officers to make such arrest." Section 1.580–3. This provision, while not informing officers that they have the authority to make such arrests on their own, does not explicitly require officers to obtain permission to make a warrantless arrest ("the Shift Commander *may* authorize ..."). The court agrees that this language is confusing in that it seems to suggest that an officer should seek authorization to effect a warrantless arrest. The language does not, however, negate the Family Violence Protection Order En-

forcement Act and the Law Enforcement Protection Act, as Williams alleges. Rather, the rule encourages officers on the scene to obtain authorization to effect warrantless arrests. Williams has not introduced evidence to show that this practice is contrary to the MPD's warrantless arrest procedures involving perpetrators of violent crimes not related to domestic violence. This challenge to the facial constitutionality of section 1.580 also fails.

### b. *Unwritten Policy*

The remainder of Williams' section 1983 allegations against the City involve allegations of an unwritten policy of discrimination against women and/ or victims of domestic violence, as applied to Ms. Williams. Williams alleges that, under color of state law, individual members of the MPD denied Ms. Williams equal protection of the law, as guaranteed by the Fourteenth Amendment to the United States Constitution, because she was a victim of domestic violence and/ or a woman.

 A local government may not be sued under § 1983 for an injury solely because the injury was inflicted by its employees or agents. *Monell v. Dept. of Social Services of City of New York,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Rather, it is only when the execution of a government's policy or custom inflicts the injury that a local government as an entity is responsible under § 1983. *Id.* Williams alleges that the MPD's policies and procedures mandating, or at least knowingly permitting, the denial of equal protection of the law to women and to victims of domestic violence are evidenced by an unwritten policy that discriminates against victims of domestic violence and women. The City, for its part, denies any policy of or intent to discriminate against these groups, and maintains that its policies require equal enforcement of the law.

To succeed on a section 1983 claim against the City for violation of the right to equal protection based on these allega-

tions, Williams must show: (1) that a City employee treated Ms. Williams differently from either a similarly-situated male victim of a crime of violence or a similarly-situated victim of a non-domestic violent crime; and (2) that the City employee who treated Ms. Williams differently was acting pursuant to a City policy designed to intentionally discriminate against women and/ or victims of domestic violence in the provision of law enforcement services. *See E & T Realty v. Strickland,* 830 F.2d 1107, 1109 and 1113–14.

Williams points to several actions and omissions by MPD officers which he alleges evidence a policy or custom of not affording equal protection to victims of domestic violence: (1) Detective Ward's alleged statements to Ms. Williams regarding her March 28, 1994 complaint; (2) the failure to fill out mandatory incident reports pursuant to Ala.Code § 15–10–3; (3) the MPD's ignorance of laws against family violence; (4) Detective Murphy's failure to take any action to protect Ms. Williams on February 12, 1996 and his alleged testimony that the handling of Ms. Williams' February 12, 1996 complaint was improper and typical of the MPD's policies for handling complaints involving allegations of domestic violence; and (5) the failure of the MPD to even attempt to serve the misdemeanor warrant against Long for the violation of the Family Violence Protection Order Enforcement Act.

 The court finds, however, that Williams' policy or custom allegations are insufficient to establish an equal protection claim. Before reaching the question of whether a City custom or policy of discrimination is the source of unequal treatment, there must be some evidence before the court which shows that unequal treatment actually occurred. The first element of an equal protection claim requires a plaintiff to establish that the plaintiff was treated differently from similarly situated persons. *See City of Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 439, 105

S.Ct. 3249, 87 L.Ed.2d 313 (1985); *Strickland v. Alderman*, 74 F.3d 260, 264 & n. 5 (11th Cir.1996). In other words, Williams must establish that a City employee treated Ms. Williams differently from either a similarly-situated male victim of a crime of violence or a similarly-situated victim of non-domestic violence. While Williams has made broad allegations to this effect, no evidence has been presented to the court to show that Ms. Williams was treated differently by the MPD than any victim of non-domestic violence or male victim of domestic violence.

■ Williams' claim appears to be that victims of domestic violence (and those receiving threats of domestic violence), because of the nature of crimes of domestic violence and certain statutes enacted to address these crimes, are entitled to heightened protection of the law, and that the failure of the City to provide such heightened protection somehow violates the principles of equal protection. While the failure of the City to aggressively enforce and utilize statutes designed to give special protections to victims of domestic violence, if proven, might have a disparate impact on women, evidence of disparate impact is insufficient to support a section 1983 claim. *Nash v. The Consolidated City of Jacksonville, Duval County, Fla.*, 895 F.Supp. 1536, 1541 (M.D.Fla.1995), aff'd, 85 F.3d 643 (11th Cir.1996).

■ Nor can the court find that any alleged failure of the City to aggressively utilize discretionary statutes designed to permit heightened protections for victims of domestic violence is a denial of equal protection to domestic violence victims. In the absence of any evidence that Ms. Williams was treated differently than similarly situated individuals, the court cannot allow this claim to proceed. The City is entitled to summary judgment on Williams' section 1983 claim for violation of equal protection for disparate treatment of victims of domestic violence and women.

## 2. *Section 1983 Failure to Train*

■ To succeed on the section 1983 claim for failure to train, Williams must show: (1) a constitutional deprivation, here alleged to be a violation of the right to equal protection, and (2) that the City employee's conduct was the result of the City's failure to train employees in the equal provision of protective services to female victims of violent crimes and/ or to victims of domestic violence under circumstances that would make it obvious to City officials that not providing such training would likely result in a violation of the equal protection rights of such victims. *See Monell v. Dept. of Social Services of City of New York*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). In other words, inadequacy of police training may serve as the basis for section 1983 liability only where the failure to train amounts to "deliberate indifference" to the rights of persons with whom the police come into contact. *See City of Canton v. Harris*, 489 U.S. 378, 390, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). A municipality can be liable under § 1983 only where its policies are the moving force behind the constitutional violation. *Id.* at 388, 109 S.Ct. 1197. Finally, for the City to be liable, its discriminatory policy or inadequate training must have caused Ms. Williams' death. *See City of Canton v. Harris*, 489 U.S. 378, 390, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

■ Williams alleges that the same incidents described above demonstrate that the City failed to adequately train its employees and that this failure to train caused the violation of Ms. Williams' constitutional right to equal protection of the law. The court found above, however, that Williams had not put forth any evidence that Ms. Williams had been treated differently than similarly situated individuals and, therefore, could not establish an equal protection violation.

Because evidence of a constitutional violation has not been shown, the court cannot find that any failure to train by the

City caused a violation of Ms. Williams' constitutional rights which would be actionable pursuant to section 1983. The court notes also that any connection between the City's alleged failure to train MPD officers about the special problems of domestic violence and Long's criminal act of killing her is simply too tenuous to create even a question of fact regarding proximate causation. For these reasons, the City is entitled to summary judgment on Williams' claim for failure to train.

### 3. State Law Claims—Substantive Immunity

Plaintiff alleges that the city is liable for the negligent failure of the MPD to protect Ms. Williams and for the breach of a statutory duty to protect. The court found above that because no evidence would support a finding that Detective Murphy had acted willfully, with malice, or in bad faith, Detective Murphy was entitled to discretionary function immunity. The court's finding, however, leaves open the possibility that Detective Murphy's failure to act immediately or some other City employee's act could be found negligent and that the City could be held liable for its employee's negligence pursuant to the doctrine of respondeat superior liability. The Alabama Supreme Court has noted that "[a] municipality ... is generally chargeable with the negligence of its employees acting within the line and scope of their employment." *Rich v. City of Mobile*, 410 So.2d 385, 387 (Ala.1982); *see also* Ala. Code § 11-93-1(5).

The City, however, says that it is entitled to "substantive immunity" as to these claims. The Alabama Supreme Court has found that public policy considerations override the general rule of municipal liability for employee negligence and prevent the imposition of a legal duty, the breach of which imposes liability, in those narrow areas of governmental activities essential to the well-being of the governed, "where the imposition of liability can be reasonably calculated to materially thwart the City's legitimate efforts to pro-vide such public services." *Rich*, 410 So.2d at 387. In other words, if the imposition of municipal liability for the negligence of the municipality's employees in rendering a service would hinder or discourage the municipality from providing the service at all, public policy would dictate that the municipality should be entitled to substantive immunity in specific instances, preventing an injured individual from recovering, but permitting society at large to enjoy the continued provision of that service.

### a. Duty to Protect

■ Any negligence found in a breach of the duty of the MPD to protect Ms. Williams must arise because of the "special relationship" alleged to have been created by her requests for help. The court found above that Detective Murphy was not under a statutory duty to take immediate action. In fact, the court finds that the only mandatory statutory duty alleged to have been violated by any City employee is the failure to comply with the mandatory written report requirement for investigations of alleged domestic violence of the officers who responded to the 911 calls from Ms. Williams' residence on September 16 and October 15, 1995. *See* Ala. Code § 15-10-3(c). The court finds that because Anthony Williams and Ms. Williams, on the advice of those officers, filed formal charges based on the incidents, and Long was convicted pursuant to those charges, the officers' failure to complete written reports was not a proximate cause of Ms. Williams' death.

Nonetheless, Plaintiff alleges that the City can be held liable for the negligent failure of the MPD to protect Ms. Williams because the City is potentially liable for the criminal acts of a third person like Long in the "special circumstances" of the present case or because of a "special relationship" between Ms. Williams and the City. *See Thetford*, 605 So.2d at 838–40 (reversing summary judgment for a hotel manager who illegally facilitated an abu-

sive husband's entrance into his battered wife's hotel room).

The City contends that it is entitled to substantive immunity and, therefore, had no legal duty to protect Ms. Williams. The City's argument is that police protection is within the narrow area "of governmental activities essential to the well-being of the governed, where the imposition of liability can be reasonably calculated to materially thwart the City's legitimate efforts to provide such public services." *Rich*, 410 So.2d at 387. In the alternative, the City argues that any actions or omissions of its employees were not the proximate cause of Ms. Williams' death.

■ To establish negligence, a plaintiff must prove: (1) a duty; (2) a breach of that duty; (3) proximate causation; and (4) damage or injury. *See Martin v. Arnold*, 643 So.2d 564 (Ala.1994). The City's first argument is that substantive immunity provides a "no duty" rule for the police department to prevent the criminal act of a third person. In *Calogrides v. City of Mobile*, the Alabama Supreme Court applied the substantive immunity rule as a matter of public policy to find that the city had no duty to provide police protection to members of the public at large. *See* 475 So.2d 560, 562 (Ala.1985). In passing, the court quoted a portion of a New York case for the proposition that:

> The amount of protection that may be provided is limited by the resources of the community and by a considered legislative-executive decision as to how those resources may be deployed. For the courts to proclaim a new and general duty of protection in the law of tort, even to those who may be the particular seekers of protection based on specific hazards, could and would inevitably determine how the limited police resources of the community should be allocated and without predictable limits....

*Id.* (quoting *Riss v. City of New York*, 22 N.Y.2d 579, 293 N.Y.S.2d 897, 240 N.E.2d 860, 860–61 (1968)). The court notes, however, that the decision by the Alabama Supreme Court in *Calogrides* was based on the fact that the city had no duty to protect members of the public at large, not on the city's duty, if any, to protect "those who may be the particular seekers of protection based on specific hazards," like Ms. Williams in the present case. *Id.*

The Alabama Supreme Court has since upheld municipal liability in situations where a police officer was on the scene and the only question was whether the officer had acted reasonably under the circumstances. *See City of Birmingham v. Benson*, 631 So.2d 902 (Ala.1993); *Tyler v. City of Enterprise*, 577 So.2d 876 (Ala. 1991); *Seals v. City of Columbia*, 575 So.2d 1061 (Ala.1991); *Luker v. City of Brantley*, 520 So.2d 517 (Ala.1987). The theory behind these exceptions to the doctrine of substantive immunity is that "[p]olicy considerations supporting immunity do not come into play when a policeman is, in fact, on the scene and in a position to control an aggressor." *Benson*, 631 So.2d at 905. The facts of the present case, however, do not involve a policeman on the scene who was in a position to control an aggressor.

The Alabama Supreme Court has not directly addressed facts similar to the present case where a plaintiff presents a protective order to a police officer at the police station, reports death threats, and requests protection from the person restrained by the protective order. Plaintiff urges this court to adopt the rule from a New York case which carved out an exception to *Riss'* general substantive immunity. *See Sorichetti v. City of New York*, 65 N.Y.2d 461, 492 N.Y.S.2d 591, 482 N.E.2d 70 (1985). The New York court held that a "special relationship" existed between the plaintiff and the city because of: (1) the protective order; (2) the police department's knowledge of the suspect's violent history and its knowledge of the specific situation in which the plaintiff had been placed; (3) its response to pleas for assistance on the day of the assault; and (4) the

reasonable expectation of police protection. *Id.* 482 N.E.2d at 75. The New York court broadly held that when the police are made aware of a possible violation of a protective order, they are obligated to respond and investigate, and that their actions will be subject to a "reasonableness" review in a negligence action. *See id.* at 76.

While the court exercised supplemental jurisdiction over the state law claims against Detective Murphy, it did so because it found application of Alabama law to those claims to be clear. Such is not the case here.

This court finds that the question of whether substantive immunity should be extended to a municipality under circumstances such as presented here, so that the City is immune from state law liability regardless of any negligence on the part of its police officers, is an important, novel, and complex issue of state law which more properly should be determined by a state court, rather than by a federal court. Accordingly, and since all federal claims over which this court has original jurisdiction are to be dismissed, the court will decline to exercise supplemental jurisdiction over these state law claims against the City, pursuant to 28 U.S.C. § 1367(c)(1) and (3) and will dismiss those claims without prejudice. Williams will then be free, if he wishes to do so, to pursue these purely state law claims in a state court. *See* 28 U.S.C. § 1367(d).

## V. CONCLUSION

There is insufficient evidence from which a jury could reasonably infer that Detective Kevin Murphy acted willfully, out of malice, or in bad faith in his dealings with Ms. Williams. Therefore, he is entitled under Alabama law to discretionary function immunity, and his Motion for Summary Judgment is due to be granted.

The City of Montgomery is entitled to summary judgment on the Plaintiff's federal law claims for the reasons discussed above. The court finds the question of whether Alabama law provides an exception to a municipality's substantive immunity on the basis of a "special relationship" arising from the facts of this case to be a novel and complex issue of state law which should more appropriately be decided by a state court, and this court declines to exercise supplemental jurisdiction over those claims. Accordingly, that Defendant's Motion for Summary Judgment will be granted as to the Plaintiff's federal law claims and denied as to the state law claims, and the state law claims will be dismissed without prejudice.